**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

ZINA M. LAWRENCE,

                              Plaintiff,

            - v -                                          Civ. No. 1:05-CV-329
                                                                      (RFT)

THOMSON LEARNING, INC., a/k/a
DELMAR PUBLISHING,

                              Defendant.

**APPEARANCES:**                              **OF COUNSEL:**

HIGGINS ROBERTS LAW FIRM                      MICHAEL E. BASILE, ESQ.
Attorney for Plaintiff
1430 Balltown Road
Schenectady, New York 12309

PHILLIPS LYTLE LAW FIRM–Albany Office         MARC H. GOLDBERG, ESQ.
Attorney for Defendant
126 State Street, 5th Floor
Albany, New York 12207

**RANDOLPH F. TREECE**
**United States Magistrate Judge**

**MEMORANDUM DECISION and ORDER**[1]

        Plaintiff Zina Lawrence brings this action pursuant to Title VII of the Civil Rights Act of

1964, codified at 42 U.S.C. § 2000e *et seq.*, alleging Defendant Thomson Learning, Inc., her former

employer, discriminated against her due to her race.  Specifically, Lawrence asserts Defendant

discriminated against her when she was passed over for a promotion, disciplined, and ultimately

discharged.  Lawrence further contends Thomson retaliated against her when she questioned the

company's commitment to its Affirmative Action Program and created a hostile work environment.

_____

        [1] Pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties consented to this Court presiding over all matters, including trial.  Dkt. No. 13.

*See generally* Dkt. No. 1, Compl.  Defendant denies any allegations of discriminatory or retaliatory

conduct and asserts that all employment decisions, including the decision to terminate Lawrence's

at-will employment, were for legitimate, non-racially based reasons.  *See generally* Dkt. No. 4,

Answer.

Currently before this Court is Defendant's Motion for Summary Judgment pursuant to

Federal Rule of Civil Procedure 56.[2]  Dkt. Nos. 17-20 & 27.  Plaintiff opposes the Motion.[3]  Dkt.

---

[2] The Court considered the following, submitted in support of Defendant's Motion:
Dkt. No. 17-2 → Marc H. Goldberg, Esq., Decl., dated Sept. 29, 2006
      Ex. 1 → Pl.'s Am. Answer to Def.'s 1st Request for Interrogs.
      Ex. 2 → NYS Div. of Human Rights Determination and Order After Investigation
      Ex. 3 → Zina Lawrence Dep. Tr., dated June 30, 2006
      Ex. 4 → Excerpts from Sherry Dickinson f/k/a Gomoll Dep. Tr., dated May 17, 2006
      Ex. 5 → Excerpts from Mark Howe Dep. Tr., dated Mar. 9, 2006
      Ex. 6 → Excerpts from Dawn Gerrain Dep. Tr., dated June 29, 2006
Dkt. No. 18-1 → Def.'s 7.1 Statement
Dkt. No. 18-2 → Def.'s Mem. of Law
Dkt. No. 19-1 → Dawn Gerrain Aff., dated Sept. 11, 2006
      Ex. 1 → Acquisition Editor Job Description
      Ex. 2 → Dickinson and Lawrence Resumes
      Ex. 3 → Interviewers' Completed Checklists for Each Candidate
      Ex. 4 → Spreadsheet Tallies from Interviews
      Ex. 5 → Dawn Gerrain's Notes on Meeting with Lawrence, dated Feb. 21, 2003, and Various Emails
      Ex. 6 → Changes to Original Funding
      Ex. 7 → Jody P. Rockett-Thomson Learning Contract, signed June 1, 2003
      Ex. 8 → Original Funding Copy Circulated
      Ex. 9 → Lawrence's Tracking Grid, dated May 16, 2003
      Ex. 10→Lawrence's Tracking Grid, dated June 13, 2003
Dkt. No. 20-1 → Carolyn Miller Aff., dated Sept. 12, 2006
Dkt. No. 20-2 → Mark Howe Aff., dated Sept. 8, 2006
      Ex. 1 → Thomson Employee Handbook
      Ex. 2 → Lawrence's Acknowledgment of Receipt of Handbook
      Ex. 3 → Thomson Code of Business Conduct and Ethics
      Ex. 4 → Lawrence Signed Statement of Compliance – Standard Business Conduct
Dkt. No. 20-7 → Susan Simpfenderfer Aff., dated Sept. 26, 2006
Dkt. No. 27-1 → Defendant's Reply Mem. of Law

[3] The Court considered the following, submitted in support of Plaintiff's Opposition to Defendant's Motion:
Dkt. No. 22-1 → Pl.'s Mem. of Law in Opp'n
Dkt. No. 23   → Pl.'s 7.1 Statement
Dkt. No. 24-1 → Michael E. Basile, Esq., Decl., dated Oct. 16, 2006
      Ex. A→ Mark Howe Dep. Tr., dated Mar. 9, 2006
      Ex. B→ Dawn Gerrain Dep. Tr., dated June 29, 2006
      Ex. C→ Sherry Dickinson f/k/a Gomoll Dep. Tr., dated May 17, 2006
      Ex. D→ Thomson Performance Reviews of Lawrence for the Periods of July 31, 1999 through Dec. 31, 1999;

Nos. 22-25.  For the reasons that follow, Defendant's Motion is **granted** and the Complaint is **dismissed**.

## I. MATERIAL FACTS

General Background

Generally, the material facts are not in dispute.[4]  At all times relevant to this action, Plaintiff Zina Lawrence was employed by Thomson Learning, Inc., a/k/a Delmar Publishing, a corporation that publishes, *inter alia*, educational and professional books and software.  Compl. at ¶¶ 9, 13, 14, & 18.  Ms. Lawrence, an African-American female, was hired in July 1999 as an Acquisition Editor (AE), and remained in that capacity until she was terminated on June 16, 2003.  *Id*.  At all times

Jan. 1, 2000 through Dec. 31, 2000; and Jan. 1, 2001 through Dec. 31, 2001
Ex. E→ Copy of Admin. Law Judge Tr. in NYS Unemployment Ins. Benefit Hr'g, dated Sept. 12, 2003
Ex. F→ Pl.'s Request for Produc. of Docs., dated Dec. 29, 2005
Ex. G→ Def.'s Resp. to Ex. F, dated Feb. 15, 2006
Ex. H→ Def.'s Resp. to Pl.'s Am. Request for Interrogs., dated Feb. 15, 2006
Ex. I → Thomson Affirmative Action Plan
Ex. J → Dawn Gerrain's Evaluation Checklist
Ex. K→ Dawn Gerrain's Notes
Dkt. No. 25-1  →  Zina M. Lawrence Aff., dated Oct. 13, 2006
Ex. A→ Lawrence's Current Resume
Ex. B→ Lt. from Greg Burnell to Lawrence, dated Feb. 2002
Ex. C→ String of Emails
Ex. D→ Admin. Law Judge Decision in NYS Unemployment Ins. Benefits Case, dated Sept. 15, 2003
Ex. E→ Copy of Original Funding with Changes

[4] Where we cite to only one party's Rule 7.1 Statement of Material Facts, the facts were taken from that party's 7.1 Statement and either the other party does not dispute the fact asserted or has offered no admissible evidence to refute that fact.  Where, however, a dispute exists, we specifically note the discrepancy.

While both attorneys did an exemplary job in setting forth the multitudinous, (un)contested material facts, and should be commended in this regard, we note there are instances where instead of admitting or denying the existence of a fact, Plaintiff states she "lacks information sufficient to form a belief" or "lacks information to admit or deny this allegation."  *See* Dkt. No. 23, Pl.'s 7.1 Statement at ¶¶ 10, 52-56, 59, 77, 87, 173, 179, 216, 219-21, 223-24, & 228.  In accordance with the Local Rules of Practice for the Northern District of New York, we believe such response is insufficient to create an issue of fact and, when properly supported by the record, we deem such statements to be admitted.  *See* N.D.N.Y.L.R. 7.1(a)(3) ("Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party.") (emphasis in original); *see also* FED. R. CIV. P. 56; *Universal Calvary Church v. City of New York*, 2000 WL 1538019, at *2 (S.D.N.Y. Oct. 17, 2000) (citing cases, including *Aztar Corp. v. New York Enter., LLC*, 15 F. Supp. 2d 252, 254 n.1 (E.D.N.Y.), *aff'd* 210 F.3d 354 (2d Cir. 2000), for the proposition that a response of "lack knowledge or information sufficient to either admit or deny" will not create an issue of fact and may properly be deemed admitted for failing to conform with the Local Rules of the District).

relevant to this action, Lawrence's employment with Thomson was at-will.  Dkt. No. 18-1, Def.'s

7.1 Statement at ¶ 8.  As an AE in Thomson's Career Education Strategic Business Unit (CESBU),

Lawrence's primary responsibility concerned the agricultural science programs.  *Id*. at ¶ 2.

According to Thomson's AE job description, an AE is responsible for

> [m]anag[ing] the growth and development of the publishing program, acquiring new
> authors, developing assigned projects; conducting market research, writing and
> implementing develop plans, manuscript reviewing, monitoring and controlling
> manuscript progress and expenses, visiting schools, finding and cultivating
> prospective authors, and managing the publishing program to achieve Thomson
> criteria for growth and profitability.

Dkt. No. 19-1, Dawn Gerrain Aff., dated Sept. 11, 2006, Ex. 1, AE Job Description; *see also* Def.'s
7.1 Statement at ¶ 3 (noting that as an AE, Lawrence was responsible for "acquiring new products,
signing team revision products, selling their products and marketing them"); Dkt. No. 23, Pl.'s 7.1
Statement at ¶ 3 (admitting all responsibilities except denying that AEs were responsible for
marketing new products); Dkt. No. 17-2, Marc H. Goldberg, Esq., Decl., dated Sept. 29, 2006, Ex.
4, Excerpts from Sherry Dickinson f/k/a Gomoll Dep. Tr., dated May 17, 2006, at p. 35 (testifying
that an AE is "responsible for acquiring new products, . . . signing team revision products, . . . selling
their products,[and] for marketing their products").

Each AE is given various goals including signing, frontlist, and topline goals, by which their

performance is judged, in part, on hitting these goals.  Def.'s 7.1 Statement at ¶¶ 4 & 5; Dkt. No. 20-

1, Carolyn Miller Aff., dated Sept. 12, 2006, at ¶ 3.  Signing goals are the number of new products

that an AE creates contracts for in any given year.  Goldberg Decl., Ex. 3, Zina Lawrence Dep. Tr.,

dated June 30, 2006, at p. 64, lines 12-14.  In reaching this goal, the AE identifies new products to

be published and finds new authors who agree to publish those products with Thomson, ultimately

resulting in a contract between the author and Thomson.  Def.'s 7.1 Statement at ¶ 4.

As an AE, Lawrence reported to the Editorial Director (ED), formerly known as Executive

Editor (EE), who in turn reported to the Vice President (VP) of the CESBU.  Between 2002 and

2003, there was a shift of many of the key players in the above-mentioned job titles.  *Id*. at ¶ 18.  In

June 2002, Marlene Pratt, then-CESBU EE, left Thomson's employ to work for a competitor,

leaving that position vacant for a considerable period of time.  *Id*. at ¶ 19.  From mid-June 2002 through early December 2002, Lawrence and the other AEs in that Unit reported to Susan Simpfenderfer, then-VP of CESBU.  *Id*. at ¶ 20.  Then, in late 2002, Simpfenderfer resigned and finding a replacement VP took precedence over replacing the EE.  *Id*. at ¶¶ 21-22.  In January 2003, Dawn Gerrain was hired as the VP of CESBU and Lawrence and the other AEs reported to Gerrain pending the selection of an EE.  *Id*. at ¶¶ 23-24.

Vacant EE Position

    The genesis of this lawsuit can be traced back to the Summer of 2002, when, after Pratt's departure, Thomson posted, both internally and externally, an employment opportunity for the vacant EE position.  *Id*. at ¶ 25.  A formal application process for that position was in place.  *Id*. at ¶ 26.  At the time of the initial posting, Lawrence did not apply for the position.  Lawrence Dep. at p. 153, lines 10-18.  Since Lawrence was a member of the interview team for potential candidates, she had access to and reviewed various applicants' resumes.  Upon concluding her review, she believed that her own background/experience either mirrored or in some instances surpassed those reflected in the resumes.  *Id*. at p. 152, lines 18-23 & p. 153, lines 1-3.  To express her interest in the vacant EE position, sometime in August 2002 Lawrence spoke separately with Susan Simpfenderfer and Nancy Roberson, Senior VP of Thomson.  Def.'s 7.1 Statement at ¶ 27; Lawrence Dep. at pp. 153-60.  The sum and substance of both conversations was the type of background and experience an EE should possess and what Lawrence could do to work towards that goal.  Lawrence Dep. at pp. 153-60.  Lawrence was encouraged to first enhance her product lists and have some of her publications go through the revision process.  *Id*. at p. 155, lines 1-7 & p. 159, lines 10-23.  Based on that feedback, Lawrence "chose not to apply for the position."  Goldberg Decl., Ex. 1, Pl.'s Am.

Answer to Def.'s 1st Request for Interrogs. at ¶ 7.  As part of her claim of discrimination, Lawrence contends that Thomson executives discriminated against her based on race when she was discouraged from seeking the promotion.  Compl. at ¶¶ 30 & 64; Lawrence Aff. at ¶ 7 (stating that Nancy Roberson and Susan Simpfenderfer discouraged her from requesting consideration of the promotion).[5]

In or around October 2002, at Lawrence's request, Lawrence met with Simpfenderfer and Mark Howe, Senior VP of Human Resources, to discuss leadership training and what she needed to do to advance to the next level.  Def.'s 7.1 Statement at ¶ 29.  Howe believed the purpose of the meeting was to discuss Lawrence's "frustration with the [EE] recruiting process and why she wasn't being considered a viable candidate for that position."  Dkt. No. 24-1, Michael E. Basile, Esq., Decl., dated Oct. 16, 2006, Ex. A, Mark Howe Dep. Tr., dated Mar. 9, 2006, at p. 61, lines 20-23.  When feedback was provided to Lawrence regarding why she was not being considered for the EE position, Lawrence retorted, in sum and substance, that she wished to focus on leadership training

---

[5] In her 7.1 Statement, Plaintiff denies that her decision not to apply was voluntary as she was "discouraged from applying for the position."  Pl.'s 7.1 Statement at ¶ 28.  However, her testimony and answers to the Defendant's Interrogatory belie such contention as she clearly indicates that she chose not to apply for the position at that time.  The reason underlying her choice is in our view irrelevant.  Furthermore, Lawrence's deposition testimony, verified Complaint, and Affidavit appear to be in conflict with each other.  Lawrence testified, in sum and substance, that Susan Simpfenderfer did not discriminate against her and was supportive of her advancement efforts while Nancy Roberson provided sound advice aiding Lawrence in setting goals for improvement.  Lawrence Dep. at p. 160, lines 1-7 ("I took [Nancy and Susan's advice] very favorably. . . . It's like I had a path, I had a direction.  I knew what I need[ed] to do in order to make it to the next level."); p. 171, lines 20-21 ("The decision not to put [an application] in was mine, yes.").  Yet, in her Complaint, she states that Thomson executives discouraged her from seeking a promotion, and in her Affidavit, Lawrence states that Nancy Roberson and Susan Simpfenderfer discouraged her from requesting consideration of the promotion, a claim that forms the basis for several of her causes of action.  Compl. at ¶ 30; Lawrence Aff. at ¶ 7.  Only in her Complaint does Lawrence assert the discouragement was racially motivated.  Compl. at ¶ 64 ("Defendant discriminated against Plaintiff on the basis of her race[ ] by discouraging her from applying for a promotion[.]").  The ostensible discrepancy is of no moment, however, since as explained more fully below, Lawrence's claim that she was discouraged from seeking a promotion in August 2002 is time barred.  See infra Part II.C.

and her future, not on her lack of qualifications.[6]  Lawrence Dep. at pp. 42-45.  The meeting ended when Lawrence said she did not want to discuss it further and "literally got up, walked to the door, opened the door, and walked out."  Def.'s 7.1 Statement at ¶ 35.  Howe and Simpfenderfer were surprised at Lawrence's behavior and considered it unprofessional.  Dkt. No. 20-2, Mark Howe Aff., dated Sept. 8, 2006, at ¶ 7; Dkt. No. 20-7, Susan Simpfenderfer Aff., dated Sept. 26, 2006, at ¶ 6.  No disciplinary action was pursued; however, upon determining Lawrence's behavior to be inappropriate, Howe and Simpfenderfer expressed to Lawrence their dissatisfaction and disappointment in how she handled herself in the meeting.  Howe Aff. at ¶ 7; Simpfenderfer Aff. at ¶ 6.

In a subsequent meeting with Howe, occurring sometime in late October 2002, early November 2002, Lawrence inquired about leadership training and the company's Affirmative Action Plan (AAP).[7]  Def.'s 7.1 Statement at ¶ 39; Pl.'s 7.1 Statement at ¶ 39; Lawrence Dep. at p. 110, lines 10-17.  At the time of this meeting, there was no formal management training available to non-managers.  Def.'s 7.1 Statement at ¶ 128.  Though the precise details of the interaction between

---

[6] It was Howe's recollection that when Susan and he began to discuss Lawrence's work competencies, Lawrence halted the discussion and stormed out stating, "[i]f I mislead you into thinking I was interested in feedback about my performance, you're mistaken."  Dkt. No. 20-2, Mark Howe Aff., dated Sept. 8, 2006, at ¶ 6; Def.'s 7.1 Statement at ¶ 33.  Plaintiff denies this point by stating her purpose in calling the meeting was to discuss future career growth and not her present qualifications, or lack thereof, for the EE position.  Pl.'s 7.1 Statement at ¶ 33 (citing to Lawrence Dep. pp. 42-45).  Notably though, Plaintiff does not overtly deny that such statement was recited.  Nor does she deny that she abruptly left the meeting, but explains that she excused herself when she became "tearful."  Dkt. No. 25-1, Zina M. Lawrence Aff., dated Oct. 13, 2006, at n.1.

[7] Since there were multiple meetings with Howe and others, a discrepancy has arisen regarding who else was present at the October 2002 meeting wherein Lawrence made an inquiry about leadership training and the company's AAP.  *Compare* Compl. at ¶ 34 ("In October 2002, Plaintiff discussed her concerns about Thomson's compliance with its own [AAP] with Thomson executive staff.") *with* Goldberg Decl., Ex. 1, Pl.'s Am. Answer to Def.'s 1st Request for Interrogs., at ¶ 7 (noting at least two different meetings occurring in October 2002, one with Howe and Simpfenderfer and the other with Howe, Simpfenderfer, and Martha Guenther, a Human Resources Representative) *with* Lawrence Aff. at ¶ 7 (stating that as early as August 2002, as part of the dialogue on leadership training, Lawrence asked Howe about the AAP) *and with* Lawrence Dep. at p. 110 (testifying about a meeting in October 2002 with Howe and Simpfenderfer when she asked about the AAP).  Notwithstanding, for our purposes, what is relevant and what remains uncontested is that at some point, Lawrence asked Howe about the AAP.

Howe and Lawrence on the AAP and training issues appear to be in dispute, including Howe's reaction to the inquiry, all agree that Lawrence made an inquiry of Howe as to the company's commitment to its AAP and that such inquiry forms the basis for Lawrence's retaliation claim.

During the Fall of 2002, Thomson interviewed several candidates, but did not hire anyone to fill the EE position. *Id*. at ¶¶ 42-43. Upon commencing her position as VP of CESBU in January 2003, Dawn Gerrain prioritized the need to fill the vacant EE position, which at that point had remained vacant for approximately six months. Dawn Gerrain Aff. at ¶¶ 4 & 6; Def.'s 7.1 Statement at ¶ 46. Thus, in mid-January 2003, the EE position was again posted internally and externally. Def.'s 7.1 Statement at ¶¶ 44-45. Thomson only received internal applications from two candidates: Zina Lawrence and Sherry Dickinson, formerly known as Sherry Gomoll, who was an AE in the company's Health Care Unit. *Id*. at ¶¶ 47 & 136.

Gerrain formed a core interview team of eleven individuals whereby each candidate was interviewed separately by each member of the interview team. *Id*. at ¶¶ 48-49 & 58. The particular interviewers were selected since they represented each function or functional area with which the EE had to interact.[8] *Id*. at ¶ 59. During each interview, Lawrence had the opportunity to ask questions of the interviewers and was satisfied with the answers she received. Lawrence Dep. at p. 203. With Howe's assistance, Gerrain compiled an evaluation checklist consisting of fifteen different competencies/attributes considered to be important for the EE position including, but not limited to, knowledge of the editorial process, interpersonal skills, leadership ability, management

---

[8] The eleven interviewers were: (1) Donna Lewis, then-Director of Marketing; (2) Wendy Troeger, Director of Production; (3) Joe Saba, Technology Project Manager; (4) Cathy Esperti, EE of Healthcare SBU; (5) Sandy Clark, EE of Trades and Technology SBU; (6) Nancy Roberson, Senior VP of Thomson; (7) Mark Howe, Senior VP of Human Resources; (8) JoAnn Madigan, Business Manager for Publishing; (9) Gail Murray, VP of Professional Sales; (10) John Young, VP of Education Sales; and (11) Dawn Gerrain. Def.'s 7.1 Statement at ¶ 58.

ability, and collaboration and organizational skills.[9]  *Id.* at ¶¶ 51 & 52.  Every interviewer filled out the evaluation form and scored the applicants in each competency based on a score of 1 to 5, with 5 being the highest, 3 being average, and 1 being the lowest.  *Id.* at ¶¶ 61-62.  The final tallies of the evaluations were 648.50 points for Dickinson and 455.50 for Lawrence.  *Id.* at ¶ 63.

In addition to the numerical scores, the interviewers had the opportunity to add comments to the evaluations.  *Id.* at ¶ 64.  Some of the interviewers expressed concerns regarding Plaintiff's grasp of the importance of not only hitting her signing goals, but also meeting her other goals.  Gerrain Aff., Ex. 3, Interviewers' Completed Checklists for Each Candidate.  A number of interviewers commented on Lawrence's understanding of the editorial process and how critical each group was to that process, while other remarks concerned Lawrence's accountability and ability to manage.  By contrast, comments with regard to Dickinson were, overall, more positive with regard to her understanding of the key issues necessary to team success, work ethic, accountability, and editorial achievements.  *Id.*

After the interviews were conducted and after receiving feedback from the interviewers, Gerrain promoted Sherry Dickinson to the role of EE.  Def.'s 7.1 Statement at ¶¶ 72 & 74.  In February 2003, Dickinson assumed her new role in the company and began supervising Lawrence and other AEs in the CESBU.  *Id.* at ¶ 92.

---

[9] To be more specific, the actual categories were: (1) Editorial Experience; (2) Goal Achievement/Drive for Results; (3) Organizational Savvy/Job Maturity; (4) Vision/Strategic Thinking; (5) Communication Skills; (6) Collaboration (Team Building)/Interpersonal Skills (Respect for Others); (7) Negotiating/Deal-Making/Acquisitions; (8) Work Ethics/Values; (9) People Management/Leadership; (10) Dependability (able to meet deadlines); (11) Entrepreneur/Creativity/Change Agent; (12) Accountability; (13) Customer/Market Focus & Knowledge; (14) Technology Awareness/Experience; (15) Fit with Thomson Culture.  Gerrain Aff., Ex. 3, Interviewers' Completed Checklists for Each Candidate.

<u>Gerrain's February 14, 2003 Email to Lawrence</u>

Once the decision to promote Dickinson was made, Gerrain offered feedback to Lawrence as to why she was not selected.  *Id*. at ¶ 75.  On February 14, 2003, Gerrain followed up that conversation with an email to Lawrence wherein Gerrain outlined a number of key competencies/attributes that Lawrence needed to focus on both in her current position and in her desire to be considered for higher level positions.  *Id*. at ¶ 78.  Though Gerrain's email doesn't appear to be the basis of any of Lawrence's causes of action, it nevertheless is important in establishing the context of Lawrence's interactions with her superiors.  Gerrain's email followed the same format as the interviewers' checklists and included feedback Gerrain received from various interviewers.  Gerrain Aff., Ex. 5.  In her email, Gerrain referenced their prior conversation and noted that she was disturbed by Lawrence's comment that she "would do what [Dickinson] asked of [her] but . . . wouldn't be volunteering any information."  *Id*.  She further assured Lawrence that she has the potential to be a "solid AE or even a higher level position," she just needed to develop and enhance certain skills to obtain these goals.

On February 18, 2003, Lawrence responded, by email, with a point-by-point rebuttal of everything outlined in Gerrain's February 14, 2003 email.[10]  Def.'s 7.1 Statement. at ¶ 80.  Gerrain was "shocked" by Lawrence's retort and was surprised to receive such a response from someone who saw herself as eligible and ready for an executive-level position.  *Id*. at ¶ 82.  Gerrain also felt that Lawrence's response was inappropriate and should not have been sent to a manager.  *Id*. at ¶¶ 82 & 89.  Examples of passages Gerrain found surprising include:

---

[10] In her 7.1 Statement, Plaintiff "[d]enies the characterization of [her] response as a rebuttal."  Pl.'s 7.1 Statement at ¶ 80.  However, when you look at the email chain, the Court is hard-pressed to imagine another adjective which more suitably describes Lawrence's response email.  *See* Gerrain Aff., Ex. 5.

- "If I in any way lead you to believe that I was looking for your support regarding my personal growth and development plans, please be assured that I was not."
- "I do not intend to spend my energies volunteering information, but [] if asked, I would answer any questions and take on assigned tasks. I believe that you are correct in expecting me to share solicited information[,] my intention is to refrain from participating in time-consuming unsolicited activities."
- "I would ask that you take note of what the review reference states about [Thomson]'s commitment to my leadership development or lack thereof. I believe that doing so will make it very clear why I'm looking to refocus my energy toward personal growth and development. Doing so will provide me a much greater return on my investment."

*Id.* at ¶¶ 81, 84 & 85.

Despite Gerrain's shock and dismay, Gerrain did not pursue any actions because she thought and hoped the response was submitted in anger. *Id.* at ¶ 90. After receiving the email, Gerrain set up a meeting with Lawrence and Howe to help Lawrence move forward and get all parties on the same page. *Id.* at ¶ 86. At the meeting, which occurred on February 21, 2003, Gerrain and Howe discussed the email, expectations they had for Lawrence, and a plan to move forward in a positive manner. *Id.* at ¶ 88; Gerrain Aff., Ex. 5. Gerrain discussed with Lawrence what Gerrain believed to be a "disconnect" between how Lawrence perceived herself and how she was perceived by others. Def.'s 7.1 Statement at ¶ 132. It was decided that Lawrence would undergo a "360" review to give her a more well-rounded and broader view of how her performance and effectiveness was viewed in the organization. *Id.* A 360 review or feedback is a comprehensive review of how a particular manager performs, not only with their direct reports, but with colleagues, peers, and customers as well. *Id.* at ¶ 131. A 360 feedback was generally only available to management personnel and was typically administered six-months to a year after an employee became a manager to help that individual become a better manager. *Id.* at ¶¶ 130-31. Lawrence did complete the 360 review in the Spring of 2003, however, due to scheduling conflicts, a meeting to discuss the results had not been scheduled. *Id.* at ¶ 133. As a result of the February Meeting, Gerrain believed Lawrence was

committed to supporting Dickinson in her new role as the EE.  *Id*. at ¶ 91.

Early Interactions Between Dickinson and Lawrence

When Dickinson first became EE, she felt that some responsibilities were not taken care of, such as the submission or completion of certain reports, due to the fact that her position had been open for such a long time.  *Id*. at ¶ 135.  She also felt that certain things that were done in the Health Care Unit, such as phasing grids, tracking grids, and elaborate monthly reports, were not being done in the Career Education Unit.  *Id*. at ¶¶ 136-37.  One of the first interactions Dickinson recalled having with Lawrence was shortly after she became the EE and had requested that her editors provide her with phasing grids.  *Id*. at ¶ 138.  In response, Lawrence inquired what the ramifications, or something along that line, would be if she did not hit the numbers in her phrasing grid.  *Id*. at ¶ 139.

A series of interactions are alleged to have taken place which may have established a friction between Dickinson and Lawrence.  Much of Dickinson's recollections are denied by Lawrence, and neither individual, on these matters, has produced evidence beyond her own sworn statement as to the true nature of these events.  First, prior to Dickinson resuming her role as EE, she attended a "postmortem" meeting for the Career Education Group wherein the President of the company inquired about a post-secondary agriculture list.  Def.'s 7.1 Statement at ¶ 143.  Lawrence announced that she had the list and had several titles that were going to be published in the very near future, between twelve and eighteen months.  *Id*. at ¶ 144.  After becoming EE, Dickinson asked Lawrence for the list of titles in the post secondary agriculture list that were being published in the next eighteen to thirty-six months.  *Id*. at ¶ 145.  Dickinson testified that Lawrence relayed she could not accommodate her request for approximately two weeks and that if the information was needed

sooner, Dickinson should look in the status binder. *Id*. at ¶ 145. Lawrence, not surprisingly, denies that she ever told Dickinson to find the information herself. Pl.'s 7.1 Statement at ¶ 145 (citing Lawrence Aff. at n.2). Both agree, however, that Lawrence ultimately completed the task. Def.'s 7.1 Statement at ¶ 146. Dickinson claims she considered Lawrence's response to be insubordinate, notwithstanding Lawrence's compliance. *Id*. Dickinson states that though she conveyed to Lawrence her sentiments on the inappropriateness of her response, she did not, given that she was new to the team, indicate to Lawrence that she considered the statement to be insubordinate; Lawrence denies that such conversation took place. *Id*. at ¶¶ 146-47; Pl.'s 7.1 Statement at ¶ 146-47 (citing Lawrence Aff. at n.2). Upon receiving the list, Dickinson realized that Lawrence's representations were more "robust" in that the timetables for the publications were actually twelve to thirty-six months; she declined, however, to express this sentiment to Lawrence because she was giving Lawrence the benefit of the doubt. Def.'s 7.1 Statement at ¶¶ 148-49. Lawrence denies that she misrepresented the number of texts on her ready for publication list or the time frame for same. Lawrence Aff. at n.2.

Then, on March 11, 2003, Dickinson requested by email that Lawrence provide her with the funding reports by March 14th, notwithstanding the fact that checklists were not finalized. Def.'s 7.1 Statement at ¶ 140. It is Dickinson's recollection that Lawrence responded that she would not do it and that if Dickinson wanted the information she should do it herself because Lawrence had already submitted her monthly reports. *Id*. at ¶ 141. Lawrence categorically denies that she responded in this manner. Pl.'s 7.1 Statement at ¶ 141 (citing Lawrence Aff., Ex. C, Copy of Email, dated Mar. 11, 2003). Ultimately, Lawrence complied with the request. Def.'s 7.1 Statement at ¶ 142.]

Pricing Decrease

On or about March 11, 2003, Nigar Hale, an employee in the Marketing Division of the CESBU, requested a price reduction in some of Lawrence's titles. *Id.* at ¶ 150. Pricing is a critical part of an AE's list management responsibilities; when the price of a title is reduced, it brings in less revenue, thus, justification for a price reduction must be supported by market conditions. *Id.* at ¶¶ 151-52. Hale sent an email to Donna Lewis, then-Marketing Director, representing that she and Lawrence received complaints from some customers regarding the pricing of specific titles and that after researching some competitors, they recommend price decreases on certain titles. Gerrain Aff., Ex. 5 at unnumbered pp. 15-16, Email, dated Mar. 11, 2003. Lawrence and Dickinson were both carbon-copied on the email. *Id.* The string of emails on this issue were the subject of a written warning Lawrence received in March 2003. Lawrence contends the written warning that followed was improperly motivated by her race and contributed to a hostile work environment. Below is the sum and substance of the series of exchanges on the pricing decrease issue.

In response to Hale's initial email, Lewis sought specifics regarding Thomson's list/net prices and the competitor's list/net prices. *Id.* at unnumbered pp. 15-16, Email, dated Mar. 12, 2003. After receiving the pricing information, Lewis requested even more details:

> Why would we go way below the competitor . . . . I think we are leaving money on the table by going as steep as you both want to go. . . . Did you check with any reps on this to see if they had trouble selling this book through??? . . . Are you guys positive that we are loosing [sic] a ton of market share here? If we lower the price are we going to find new customers and gain market share?

*Id.* at unnumbered pp. 13-14, Email, dated Mar. 14, 2003.

Dickinson agreed with Lewis's inquiries:

> [The] original e-mail surprised me because there was no justification included and I wasn't sure what the procedures were on this team for reducing price. We need to be diligent in our research before requesting a price decrease. Donna's questions are

*-14-*

> exactly the ones I want to pose to both of you.  While Donna and I support a price
> decrease, we cannot support the drop you recommend and we do need the
> documentation in place before we move forward with this.

*Id*. at unnumbered p. 13, Email, dated Mar. 14, 2003.

After receiving Dickinson's email, Lawrence, for the first time, joined the discussion stating

> I feel that the amount of data collection and feedback needed to process price
> decreases is prohibitive – I will refrain from doing so in the future and will simply
> pass feedback/comments I receive regarding pricing issues directly to you and
> Donna.  If you feel an issue warrants my time and attention to rectify, please provide
> me with your specific questions and a schedule for supplying the requested answers
> thereby giving me the opportunity to arrange my schedule accordingly.

*Id*.

Lewis responded that in order for a reasonable decision to be made without "leaving money on the

table," the questions posed are the data required when seeking price decreases.  *Id*. at unnumbered

pp. 12-13, Email, dated Mar. 18, 2003.  Lewis further stated,

> I am sorry you feel this is too much information requested.  If your assistant can not
> help find the information, Zina . . . then we will not likely decrease the prices.  I am
> open to help price the titles competitively but I can not do my job without this
> information and am not sure how you both would feel comfortable that the decision
> is a good one without the information at hand.

*Id*.

Dickinson joined Lewis's sentiments and further added, "[t]he reality is that both of you are closer

to this. . . . This is not an arbitrary request designed to make your jobs more difficult.  You must

understand that Donna and I will have to justify this decrease all the way up the ladder which is

impossible to do without all the necessary information."  *Id*. at unnumbered p. 12, Email, dated Mar.

18, 2003.  On March 19, 2003, Lawrence responded: "I appreciate your input.  Please note that I will

not pursue decreases for the aforementioned titles."  *Id*., Email, dated Mar. 19, 2003.  On March 20,

2003, Dickinson responded as follows:

> I want to make one thing perfectly clear.  If you believe this price decrease should
> take place because it is a solid business decision then you cannot change your mind

> just because of the level of backup that Donna and I require.  Zina, if you truly think
> we need to make this change then you cannot be detered [sic] by the amount of work
> that must be done prior to a decrease.  You both brough[t] this [to] our attention for
> a reason.  Are you dropping [sic] because of business reasons or because of the
> work?  Either way, I would like to know.

*Id*. at unnumbered pp. 11-12, Email, dated Mar. 20, 2003.

Lawrence responded:

> I do not wish to speak for Nigar however I am dropping this because of the work.
> It is imperative that I manage my time effectively if I am to succeed with my list
> development goals – a significant part of that management is prioritizing my task
> lists.  Although I do believe the price decreases I requested are in the best interest of
> the individual titles and my list as a whole, my other responsibilities take precedence.

*Id*. at unnumbered p. 11, Email, dated Mar. 20, 2003.

To which Dickinson reminded Lawrence that "part of an AE's responsibility is list management. .

. . As one of the basic expectations of your job, you cannot simply unilaterally remove it from your

plate because you don't want to do the justification required especially since you state that it is in

the best interest of the individual titles and your list as a whole."  *Id*.  In response, Lawrence stated:

> I neither have the inclination or the authority to unilaterally remove any tasks from
> my plate.  Furthermore, there has never been a task put before me that I fail to do
> because "I don't want to".  I very much want you to be assured that I know that basic
> expectations of my job and that I will continue to fulfill them to the best of my
> ability.  There are several tasks that require my attention and I have seen it as my
> responsibility to prioritize these tasks with my list development goals in mind.  If
> you would like me to discontinue acting in this capacity, please let me know – at that
> time I will begin preparing a weekly or, if you prefer, a daily task list for your
> approval.

*Id*., Email, dated Mar. 21, 2003.

Thus concluding the email chain on the pricing issue.

<u>Warnings–Written and Verbal</u>

Dickinson considered Lawrence's emails as tantamount to insubordination and a challenge

to her authority since on multiple occasions, Dickinson believed Lawrence refused to provide the

back-up required for a price reduction.  Def.'s 7.1 Statement at ¶¶ 164 & 166.  Dickinson considered

the statement "I neither have the inclination or the authority to unilaterally remove any tasks from my plate" to be insubordinate. *Id*. at ¶ 164.  Upon reviewing the email chain, Howe also considered Lawrence's tone inappropriate and insubordinate since Lawrence refused to do what a supervisor requested of her. *Id*. at ¶ 165.  In reviewing the same email chain, Gerrain considered the following response in Lawrence's March 14, 2003 email to be a refusal to do the work required to justify the price decrease recommendation:  "I feel that the amount of data collection and feedback needed to process price decreases is prohibitive – I will refrain from doing so in the future and will simply pass feedback/comments I receive regarding pricing issues directly to you and Donna. . . . Please note that I will not pursue price decreases for the aforementioned titles."  Def.'s 7.1 Statement at ¶ 167.

A few days after the email exchange on the pricing issue, on March 24, 2003, Dickinson emailed Lawrence to let her know about a shift in offices wherein a sales associate would move into Lawrence's office, who would move into Dickinson's office, who would move into a newly constructed office.  Gerrain Aff., Ex. 5 at unnumbered p. 20, Email, dated Mar. 24, 2003.  In her email, Dickinson acknowledged Lawrence's allergy to the blinds and assured her that her blinds would be moved as well.  *Id*.  Lawrence replied, "I am obviously not going to be given a choice about this so, 'so be it'.  Please let me know when this change is scheduled to take place as I have several personal items in my office that I will need to take care of."  *Id*.  Then, that same date, in response to Dickinson's request that all AE's update their monthly report, Lawrence stated,

> the beauty of submitting my monthly report by the 20th of each month is that it allows the Director's [sic] and Sandra sample [sic] time to prepare our team report.  The pitfall of a 20th submission date is that information requested after that date needs to be incorporated into an already completed report.  In the interest of time-management, I would prefer to prepare and submit my monthly report only once per month.

Def.'s 7.1 Statement at ¶ 170.

*-17-*

On March 25, 2003, the following day, Dickinson issued Lawrence a written warning regarding her inappropriate/insubordinate behavior.  Gerrain Aff., Ex. 5 at unnumbered pp. 17-19, "Warning – Performance/Behavior Issues."  Dickinson and Martha Guenther presented the warning to Lawrence in a conference room in the Human Resource Department.  Def.'s 7.1 Statement at ¶ 174.  Lawrence contends that when she asked Dickinson why she did not come to speak with her first, Dickinson replied because Lawrence was a "scary person."  Lawrence Aff. at ¶ 12.  Lawrence considered such remark to be racially motivated.  *Id*.  Dickinson denies she called Lawrence a scary person and instead contends she indicated she was afraid to meet with Lawrence outside the presence of Human Resources personnel given the level of mis-communication they had experienced.  Basile Decl., Ex. C, Sherry Dickinson f/k/a Gomoll Dep. Tr., dated May 17, 2006, at p. 87, lines 11-17.  Dickinson has told other employees she was scared to meet with them without Human Resources being present.  Def.'s 7.1 Statement at ¶ 179.  At the conclusion of the meeting, Guenther requested that Lawrence sign the warning, which she refused.  *Id*. at ¶ 178.  Lawrence's refusal to sign the warning was documented on the warning, a copy of which was provided to Lawrence and another copy kept in her personnel file.  *See* Gerrain Aff., Ex. 5 at unnumbered p. 19.

A few days later, another incident occurred wherein Lawrence worked during a Team Retreat meeting.  Def.'s 7.1 Statement at ¶ 180.  Then, during a break, Lawrence reportedly discussed her salary in the presence of production personnel who earned less money than her.  *Id*. at ¶ 183.  She further spoke about the self-characterized "unfair" treatment she had received from managers.  *Id*. at ¶ 181.  On March 31, 2003, based upon Lawrence's behavior at the team building event, Dickinson issued Lawrence a verbal warning.  *Id*. at ¶ 182.

These warnings serve the basis for Lawrence's claim that Thomson discriminated against

*-18-*

her on the basis of race and created a hostile working environment wherein she was subjected to unprecedented scrutiny of her work, baseless criticisms, rude and unprofessional behavior, threats of discipline, personal attacks, and false allegations.  Goldberg Decl., Ex. 1 at ¶ 15.

Hanie-Rockett Funding Incident

From the date of the warnings until June 2003, there appeared to be a brief lull in tension, or at least no events in such time frame form the basis for any of Plaintiff's allegations.  Then, an incident occurred in June 2003 regarding the funding of one of Lawrence's projects.  Soon after the incident, Lawrence was terminated from her employment with Thomson.  Lawrence maintains that her termination was based on racial animus and was retaliation for her inquiries regarding Thomson's commitment to the AAP.  The Funding "incident" is summarized as follows.

Thomson has a formalized process, called a "Funding," which is followed before deciding whether to move forward with a particular publication or author.  Def.'s 7.1 Statement at ¶ 186.  A Funding estimates how much revenue a particular publication might generate and involves an author developing either a table of contents or a proposal for a product which is then peer reviewed.[11]  *Id.* at ¶ 188.  The Funding includes the name of the author, a table of contents, the estimated scope of the project, deadlines, author credentials, description of the product, excerpts of reviews of the project, competitive analysis, a marketing plan, the associated costs and estimated revenue, the financials, sales forecast, pricing, the investment, etc.  *Id.* at ¶ 197.

Before a text can be approved for publication, the financials or the Funding need to be

---

[11] Once an AE receives a project proposal, the AE gathers individuals considered experts in their fields to assess the plausible use of the proposal in a classroom.  The peer reviewers, typically academics or people who work in the same field as the author, review the proposal not only for content, but also for market suitability.  Lawrence Dep. at pp. 91-92.  The peer review process allows the AE to gain an understanding of whether the proposed product will be viable. *Id.*

reviewed. *Id*. at ¶ 192.  Fundings are approved at different levels of authority depending on the dollar amount associated with the product. *Id*. at ¶ 190.  The purpose of the approval process is to make sure the financials are warranted as a lot of resources are necessary to create a textbook. *Id*. at ¶ 191.  Though contested by Lawrence, according to Gerrain, it is common practice and procedure that all Fundings require approval and if a change is necessary, especially with an author and the title, the project/changes must be re-approved or communicated to a supervisor so that the team is aware of the change. *Id*. at ¶ 190 (citing Gerrain Aff. at ¶ 46); Pl.'s 7.1 Statement at ¶ 190 (citing Lawrence Aff. at ¶¶ 14-18).

As it relates to the Funding process, a publication's "vision" is the scope of a particular product and defines why Thomson would develop a particular publication. *Id*. at ¶ 185.  The product vision defines what the market is going to be and what the book is going to contain. *Id*.  The inclusion of a table of contents in the approval process identifies the vision and notifies those looking at the proposal that the peer reviewers accepted the table of contents. *Id*. at ¶ 193; Lawrence Dep. at p. 97, lines 9-14.  According to Dickinson, when the author and table of contents are changed, the scope of the project changes as does the vision of the book. Def.'s 7.1 Statement at ¶¶ 194-95 (citing Dickinson Dep. at p. 120); Pl.'s 7.1 Statement at ¶¶ 194-95 (citing Lawrence Dep. at pp. 97-98 & 367-70 and noting that this is not always the case and such changes are the AE's concern, not other persons involved in the Funding review).

The Funding process consists of an approval routing sheet, an executive summary of the project, as well as the strategic and financial information about the project. Def.'s 7.1 Statement at ¶ 196.  The White copy of a Funding is one that has not yet gone through the approval process and is reviewed by every member of the team, as well as the developmental editor, marketing manager,

and, if it was a large number of "plate," the production manager. *Id.* at ¶ 199. Once the White copy is reviewed, a Yellow copy of the Funding is generated with financials and the publication is circulated for a second view for approval. *Id.* at ¶ 200. After a Funding is approved, it is Gerrain's responsibility to sign a contract with the approved author. *Id.* Prior to signing this contract, Gerrain reviews a "white" photocopy of the Yellow Funding. *Id.*[12]

On April 30, 2003, Lawrence submitted a Funding approval for a publication entitled <u>Large Animal Clinical Practices for Veterinary Technicians</u>, by author Elizabeth Hanie (Hanie Project). *Id.* at ¶ 201. The Hanie Project Funding documents contained an executive summary with cost analysis, a proposal narrative, reviewer comments indicating, *inter alia*, whether the reviewer would adopt the publication, sales and revenue worksheet, product specification worksheet, and schedule. *Id.* at ¶ 202. The Hanie Project, categorized as a "B" Funding, was approved on May 7, 2003, by Dawn Gerrain, Donna Lewis, Carolyn Miller, Joseph Saba, Sherry Dickinson, and Joann Madigan.[13] *Id.* at ¶¶ 203-04.

---

[12] The protocol described above conforms with Lawrence's stated understanding of the Funding process:

> [An AE shall d]evelop list of desired projects, solicit project proposals from well-qualified author candidates, secure proposal reviews from well-qualified expert peer reviewers, develop draft (white) funding using template and funding financial guidelines, circulate draft funding amongst the team, revise draft funding based on team feedback and create "yellow" funding, circulate "yellow" funding for approval on and off team as dictated by funding financials, prepare and send contracts to author, give signed contracts and approved funding to SBU VP for final execution, and file funding documents.

Goldberg Decl., Ex. 1, Pl.'s Am. Answer to Def.'s 1st Request for Interrogs. at ¶ 22.

[13] The Funding approval process is broken down into three categories: "A" Fundings, projecting sales of $350,000 to $500,000; "B" Fundings, projecting sales of $200,000 to $350,000; and "C" Fundings, projecting sales up to $200,000. Dkt. No. 20-1, Carolyn Miller Aff., dated Sept. 12, 2006, at ¶ 5. The type of Funding determines who needs to approve it; for example, a "C" level Funding requires approval from the director of the unit, executive editor, executive marketing manger, executive production manager, and a business manager, while the next level, a "B" Funding, requires additional approval from Senior VP Roberson, and others at her level. Gerrain Aff. at ¶ 47; *see also* Basile Decl., Ex. B, Dawn Gerrain Dep. Tr., dated June 29, 2000, p. 177, lines 7-23. Because the Hanie Project was a "B" Funding, it was approved by the director of the unit (Gerrain), executive editor (Dickinson), executive marketing manager (Lewis), executive production manager (Miller), technology production manager (Saba), and publishing business manager (Madigan). *See* Gerrain Aff., Ex. 6.

*-21-*

After the Hanie Project went through the final approval, but before any contract was executed by Thomson, the Project "fell through" because Hanie wanted additional resources. *Id.* at ¶ 205. At that point, Lawrence took the final Yellow Funding approval pages from the Hanie Project, covered the name of the author and title with "White-Out," and replaced it with a new author and title, Jody Rockett, Veterinary Clinical Procedures of the Horse and Cow (Rockett Project). She then attached the "revised" funding backup for the Rockett Project to the final Yellow Funding. *Id.* at ¶ 206. These changes were made without obtaining a "second view" or Funding sheet for approval of the Rockett project. Lawrence contends a second view or approval was unnecessary since, in her view, the Project had already received a second view and had not changed. *Id.* at ¶ 207; Pl.'s 7.1 Statement at ¶ 207 (citing Lawrence Dep. at pp. 108-09). It was Lawrence's decision alone to replace the Hanie Project with the Rockett Project and Lawrence did not discuss the substitution with any of her supervisors, including Dickinson. Def.'s 7.1 Statement at ¶¶ 209 & 211.[14] Lawrence did not believe that the table of contents and the name of the author were important to the Funding process and thought both books covered the same types of animals. *Id.* at ¶¶ 212 & 214. She believed the significant difference between the Hanie and Rockett Projects was that the Hanie Project was broader in scope in that it took on some non-physiological aspects. *Id.* at ¶ 215.

On June 10, 2003, at a weekly team meeting, the weekly signings were announced including the Rockett Project. Carolyn Miller, who approved the Hanie Project, did not recall Rockett being

---

[14] Lawrence contends she told Rebecca Switts, her administrative assistant, and Carolyn Miller that she was changing the authors due to Hanie's financial demands. Lawrence Aff. at ¶ 17. Miller has no recollection of such conversation. Dkt. No. 20-1, Carolyn Miller Aff., dated Sept. 12, 2006, at ¶ 13. In any event, it is uncontested that neither Switts nor Miller hold supervisory positions over Lawrence and that the changes were not conveyed to any supervisor.

previously approved.  Dkt. No. 20-1, Carolyn Miller Aff., dated Sept. 12, 2006, at ¶ 8.  After the original Funding sheet was pulled from the file, it was revealed that Hanie's name and the title of her book had been whited-out with Rockett's name and the new title written in its place.  Def.'s 7.1 Statement at ¶ 217.  Additionally, the original pages containing the approved signatures for the Hanie Project were stapled to the Rocket Project Funding.  *Id.*  Because Dickinson could not locate Gerrain, she sought Roberson's advice.  *Id.* at ¶ 219.  They both went through Lawrence's tracking grids[15] to determine the point that Rockett first appeared on them, which they discovered had been a few weeks prior.  *Id.* at ¶ 220.  On Lawrence's May 16, 2003 tracking grid, the Hanie Project had estimated first year sales of $175,054 and Rockett $60,000.  *Id.* at ¶ 221.  On Lawrence's June 13, 2003 tracking grid, Hanie was removed and Rockett appeared with the first year sales of $175,054, the same estimate as the Hanie Project it replaced.  *Id.* at ¶ 222.  Miller notified Gerrain that a Funding had been whited-out and altered after it had gone through the internal approval process. *Id.* at ¶ 224.

Upon learning of the change, Gerrain was shocked since, in her experience, a change like this was not done by an AE without first communicating it to the supervisor, or "refunding" the project, that is, obtaining a whole new set of approvals.  Gerrain Aff. at ¶ 43.  Though Lawrence contends she made no overt effort to conceal the change, as evidenced by the fact that she used white-out on yellow paper, Gerrain contends that she typically receives a white photocopy of the Yellow Funding, and therefore would not be alerted to any patent change.  Def.'s 7.1 Statement at ¶¶ 226-27; Pl.'s 7.1 Statement at ¶¶ 226-27 (citing Lawrence Aff. at ¶ 17).  Gerrain asserts that she had not seen the original Yellow Funding sheet for if she had, she would have seen the whited-out

---

[15] As part of an AE's duties, they are required to track their publications on a document called a tracking grid. Def.'s 7.1 Statement at ¶ 221.

changes and immediately questioned them.  Def.'s 7.1 Statement at ¶ 228.

When Gerrain and Dickinson spoke with Lawrence about the changes, Lawrence indicated that she did not think it was a big deal; from her viewpoint, the essence of the project was the same and she had just changed the author.  *Id*. at ¶¶ 230 & 241.  Though no written guidelines exist, Gerrain contends it was common knowledge that the proper Funding protocol in such an instance was to refund the project.  *Id*. at ¶¶ 231-32.  Gerrain told Lawrence that the proper procedure was to refund the publication or communicate it with her manager and team members.  *Id*. at ¶ 234.  Dickinson also told Lawrence that in her experience as an editor, refunding was the proper procedure and that Lawrence should have communicated what was going on to a supervisor.  *Id*. at ¶ 233.

After conferring with other business units, Gerrain learned that one other employee, a male Caucasian AE, was terminated for deceitful behavior concerning a Funding.  *Id*. at ¶ 237.  Other than that instance, Thomson is not aware of any other occasion where an employee had changed a Funding without refunding it or getting approval from a supervisor.  *Id*.  After the collaboration, it was concluded that Lawrence's changing of the author and whiting it out without communicating it to her manager went to the fundamental role of an AE and the trust required of the position.  *Id*. at ¶ 239.  Gerrain felt that changing the author and title with white-out and then placing the Funding in a file without communicating the change to anyone was an attempt to conceal the change and determined that termination was appropriate.  *Id*. at ¶ 240; Gerrain Aff. at ¶ 55.

On June 16, 2003, Lawrence's employment with Thomson was terminated.  Def.'s 7.1 Statement at ¶ 242.  According to Defendant, Lawrence's termination was based on a series of behavioral issues, warnings, lack of communication, challenging of authority, Lawrence's

declination to be a team player, and the funding incident. *Id*. at ¶ 243. Lawrence proclaims she did not violate any company protocol and that race discrimination and retaliation were the true driving force behind her termination.

## II.  DISCUSSION

### A.  Standard of Review

A court may grant summary judgment only where "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c).  An issue is genuine if the relevant evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A party seeking summary judgment bears the burden of informing the court of the basis for the motion and of identifying those portions of the record that the moving party believes demonstrate the absence of a genuine issue of material fact as to a dispositive issue. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

If the movant is able to establish a *prima facie* basis for summary judgment, the burden of production shifts to the party opposing summary judgment who must produce evidence establishing the existence of a factual dispute that a reasonable jury could resolve in its favor. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The non-moving party must show, by affidavits or other evidence, admissible in form, that there are specific factual issues that can only be resolved at trial. *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir.  1995).

In determining whether to grant summary judgment, the Court must resolve all ambiguities and draw all reasonable inferences from the submitted materials in a light most favorable to the non-moving party.  *Patterson v. County of Oneida, New York*, 375 F.3d 206, 219 (2d Cir. 2004).

However, a party opposing a properly supported motion for summary judgment may not rest upon "mere allegations or denials" asserted in the pleadings, *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525-26 (2d Cir. 1994), or on conclusory allegations or unsubstantiated speculation, *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998). In this regard, a non-moving party may not create a question of fact by simply making vague, conclusory allegations or broad denials. *Govan v. Campbell*, 289 F. Supp. 2d 289, 295 (N.D.N.Y. 2003). Further, the non-moving party cannot defeat summary judgment by "simply show[ing] that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*, 475 U.S. at 586, or by a factual argument based on "conjecture or surmise[,]" *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991). Summary judgment will be granted when it is apparent on the facts presented that no rational trier of fact could find in favor of the non-moving party because evidence supporting the essential elements of the non-movant's claim is lacking. FED. R. CIV. P. 56(c); *Celotex Corp.v. Catrett*, 477 U.S. at 322.

## B.  Summary Judgment in Title VII Cases

Courts are particularly cautious about granting summary judgment to an employer in a discrimination case where, more often than not, it is the employer's intent that is in question. *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994); *see also Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997); *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985). Because direct evidence of an employer's discriminatory intent will rarely be found, "affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d at 1224. However, even in the discrimination context, a plaintiff must provide more than conclusory

allegations of discrimination to defeat a motion for summary judgment. *Meiri v. Dacon*, 759 F.2d at 998. While courts are often hesitant to resolve discrimination claims on summary judgment because the employer's intent is typically at issue, summary judgment is appropriate where the non-moving party's evidence is "so scant that a rational jury could not find in its favor." *Chertkova v. Connecticut Gen. Life Ins. Co.*, 92 F.3d 81, 86-87 (2d Cir. 1996). This is true even where an employer's state of mind is at issue; to conclude otherwise would necessitate a trial in all discrimination and retaliation cases. *See Meiri v. Dacon*, 759 F.2d at 998 ("The summary judgment rule would be rendered sterile . . . if mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion.").

### C.  Time Barred Claim

In her Complaint, as part of her Second Cause of Action, Lawrence alleges Thomson discriminated against her by, *inter alia*, "discouraging her from applying for a promotion." Compl. at ¶ 64. The facts upon which this part of her claim is based can be found in paragraphs 29-30 of her Complaint wherein she states that in response to her promotion inquiries, "Thomson executives discouraged Plaintiff from seeking the promotion." *Id.* at ¶¶ 29-30; *see also* Lawrence Aff. at ¶ 7 (noting that she expressed an interest in the vacant EE position and that Susan Simpfenderfer and Nancy Roberson discouraged her from requesting consideration); *supra* note 5 (noting the discrepancy between Lawrence's testimony and sworn written statements). As part of its Motion for Summary Judgment, Thomson seeks a ruling from this Court finding such claim to be time barred under Title VII.

Because Plaintiff's opposition papers did not address Defendant's Motion for Summary Judgment on this claim, the claim is deemed abandoned and summary judgment could be granted

on that basis alone. *See Taylor v. City of New York*, 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003) ("Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way." (citation omitted)); *see also Garrett v. Garden City Hotel, Inc.*, 2007 WL 1174891, at *17 (E.D.N.Y. Apr. 19, 2007) (citing cases). Notwithstanding Plaintiff's purported abandonment of this claim, we find that Defendant is correct and such claim is time barred.

On January 23, 2004, Lawrence filed a charge of discrimination with the New York State Division of Human Rights (NYSDHR) alleging unlawful discriminatory practice relating to employment because of race/color and discrimination/retaliation. On October 6, 2004, after conducting an investigation, the NYSDHR concluded there was no probable cause to support the allegations. Goldberg Decl., Ex. 2, NYSDHR Determination and Order After Investigation. After receiving a right-to-sue letter, Lawrence commenced this action on March 15, 2005.

Under Title VII, a charge "shall be filed by or on behalf of the person aggrieved within three hundred days after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e-5(e)(1); *see also Zerilli-Edelglass v. New York City Transit Auth.*, 333 F.3d 74, 76 (2d Cir. 2003) (cited in *Grobert v. Career Educ. Corp.*, 2006 WL 721357, at *2 (E.D.N.Y. Mar. 20, 2006)). Title VII claims of discrimination or failure to promote are based on "'discrete acts,' each giving rise to a separate cause of action." *Petrosino v. Bell Atl.*, 385 F.3d 210, 220 (2d Cir. 2004) (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002)). Since Lawrence's claim that Thomson executives discouraged her from seeking advancement due to her race occurred on or about August 2002, the latest October 2002, and a charge was not filed with the NYSDHR until January 2004, such claim is barred. *Id.* ("The law is clear that termination and promotion claims may not be based

on discrete acts falling outside the limitations period."); *see also Garrett v. Garden City Hotel, Inc.*, 2007 WL 1174891, at *9-10; *Carter v. New York*, 310 F. Supp. 2d 468, 480 (N.D.N.Y. 2004); *Dorrilus v. St. Rose's Home*, 234 F. Supp. 2d 326, 331-32 (S.D.N.Y. 2002).  Accordingly, this claim is **dismissed**.

### D.  Unlawful Discrimination

Lawrence maintains that Thomson unlawfully discriminated against her due to her race when (1) she did not receive a promotion to the EE position in January 2003, (2) she received written and verbal warnings, and (3) was terminated from employment.  As explained more fully below, summary judgment is appropriate because, ultimately, Plaintiff has not established a triable issue of fact with respect to whether Defendant's articulated legitimate, non-discriminatory reasons for its employment actions were merely pretexts for discrimination.

Title VII makes it unlawful for employers "to discriminate against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. 2000e-2(a)(1).  When a Title VII plaintiff cannot provide direct evidence of discrimination, courts generally use the tripartite burden-shifting approach set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973), to evaluate the strength of the Title VII claim.  Under this burden shifting test, Plaintiff must first establish, by a preponderance of the evidence, a *prima facie* case of discrimination.  Establishment of the *prima facie* case essentially creates a presumption that the employer unlawfully discriminated against the employee.  *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981) (noting that establishing a *prima facie* case serves an essential function in Title VII cases because it "raises an inference of discrimination only because we presume these acts, if otherwise

unexplained, are more likely than not based on the consideration of impermissible factors."). A plaintiff's burden in presenting *prima facie* evidence of discriminatory treatment is *de minimis*. *See, e.g.*, *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 126 (2d Cir. 2004). "The requirement is neither onerous nor intended to be rigid, mechanized or ritualistic." *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 467 (2d Cir. 2001) (internal quotation marks and citations omitted).

Once the plaintiff establishes a *prima facie* case, the burden of production shifts to the employer to rebut the presumption by articulating a legitimate, non-discriminatory reason for its actions.[16] *Fisher v. Vassar College*, 114 F.3d 1332, 1335-36 (2d Cir. 1997). Any legitimate reason rebuts the presumption. The burden is one of production, not persuasion, thus a defendant need not persuade the court it was actually motivated by the proffered reason. *Id.*; *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 142 (2000) (citation omitted) (noting no credibility assessment is permitted); *Griffin v. Ambika Corp.*, 103 F. Supp. 2d 297, 307 (S.D.N.Y. 2000) (quoting *Fisher v. Vassar College*, 114 F.3d at 1335-36). If the defendant meets this burden, then the presumption simply falls away and the burden shifts back to plaintiff to demonstrate, by a preponderance of the evidence, that defendant's proffered reason is a pretext. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993). Notwithstanding the shift of evidentiary burdens, "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Griffin v. Ambika Corp.*, 103 F. Supp. 2d at 307 (quoting *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. at 143).

---

[16] The shift in burden of production to the employer serves a dual purpose.
First, it enables the employer, by proffering legitimate reasons for the alleged discriminatory discharge, to rebut the inference of discrimination that arises from proof of the *prima facie* case. In addition, the burden of production frames the factual issue with sufficient clarity to afford the employee a full and fair opportunity to demonstrate pretext.
*Meiri v. Dacon*, 759 F.2d at 996.

### 1.  Failure to Promote

We first address Lawrence's claim that Thomson refused to promote her to the EE position in January 2003 because of her race.  To establish a *prima facie* case of discrimination with respect to a failure to promote claim, Lawrence must provide sufficient evidence of the following: "(1) she belongs to a protected class; (2) she was qualified for the position for which she applied; (3) despite her qualifications, she was subjected to an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of unlawful discrimination[.]"  *Marshall v. State of New York Div. of State Police*, 18 F. Supp. 2d 194, 198 (N.D.N.Y. 1998) (citing *Cook v. Arrowsmith Shelburne, Inc.*, 69 F.3d 1235, 1239 (2d Cir. 1995)); *see also Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 101 (2d Cir. 2001).

Viewing the facts in the light most favorable to Plaintiff, the non-moving party, and keeping in mind Plaintiff's initial *de minimis* burden, *McLee v. Chrysler Corp.*, 109 F.3d 130, 134 (2d Cir. 1997), the Court finds Plaintiff establishes a *prima facie* case of discrimination at least insofar as Defendant does not appear to contest the elements of Plaintiff's *prima facie* case.[17]  As an African-American woman who was denied the EE promotion, Lawrence easily satisfies prongs one and three of her *prima facie* case since she is a member of a protected class who suffered an adverse employment action.  *Wolf v. Bd. of Educ. of City of New York*, 2000 WL 28157, at *3 (S.D.N.Y. Jan. 14, 2000) ("[T]he failure to promote . . . clearly rises to the level of adverse employment decisions.");  *Marshall v. State of New York Div. of State Police*, 18 F. Supp. 2d at 198 (noting that

---

[17] Though in its Motion for Summary Judgment, Defendant asserts Plaintiff fails to set forth a *prima facie* case of discrimination with regard to her failure to promote claim, the substance of its argument centers around Plaintiff's inability to carry her ultimate burden of showing that racial discrimination played a role in the decision to promote Dickinson instead of Lawrence, a burden Plaintiff carries <u>after</u> she establishes her *prima facie* case and the Defendant submits its legitimate, non-discriminatory reason.  Thus, for purposes of this Motion, we find that Plaintiff ekes out a *prima facie* case.

since plaintiff was not hired as assistant director, she was subjected to an adverse employment action).  And, with regard to prong two, it does not appear to be disputed, at least for the failure to promote claim, that Lawrence was qualified for the promotion and that Dickinson, a member outside the protected class, was in fact hired for the position over Plaintiff.  *See Thornley v. Penton Publ'g, Inc.*, 104 F.3d 26, 29 (2d Cir. 1997) (noting that in determining whether an employee is "qualified" a court must examine "the criteria the employer has specified for the position." (quoted in *Gonzalez v. City of New York*, 354 F. Supp. 2d 327, 335 (S.D.N.Y. 2005))); *Marshall v. State of New York Div. of State Police*, 18 F. Supp. 2d at 198-99 (noting that an inference of discrimination is present, for purposes of the *de minimis* burden of a *prima facie* case, when "hiring or promotional preference is given to a member of a non-protected group" (citing *Powell v. Syracuse Univ.*, 580 F.2d 1150, 1156 (2d Cir. 1978))).

Thus, having established a *prima facie* case, the burden shifts to Thomson to articulate a legitimate, non-discriminatory basis for the failure to promote Plaintiff.  To wit, Defendant succinctly states that each candidate was interviewed and evaluated by eleven independent interviewers and based upon their feedback and tallying of the scorecards, Dickinson was deemed the more qualified candidate.  As Defendant's burden is merely one of production, not persuasion, such explanation is satisfactory.  *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. at 142 (citation omitted) (explaining that the court does not apply a credibility assessment to defendant's proffered reason).

Having met its burden, the presumption triggered by Lawrence's *prima facie* case evaporates and the burden shifts back to Lawrence to demonstrate, by a preponderance of the evidence, "circumstances that would be sufficient to permit a rational finder of fact to infer that the

defendant's employment decision was more likely than not based in whole or in part on discrimination." *Feingold v. New York*, 366 F.3d 138, 152 (2d Cir. 2004) (citation omitted).  Stated another way, Lawrence must establish that Thomson's presumptively valid explanation was merely a pretext for discrimination.  *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. at 143.  Plaintiff cannot meet such burden.

The Second Circuit instructs courts to apply a case-by-case approach examining relevant factors including "the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports [or undermines] the employer's case." *James v. New York Racing Ass'n*, 233 F.3d 149, 156 (2d Cir. 2000) (quoting *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. at 148-49); *see also Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 102 (2d Cir. 2000) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. at 147).

In support of her discrimination claim, Lawrence asserts that Thomson improperly and inappropriately utilized a subjective standard for evaluating the two candidates.  Expatiating further, Lawrence states that Dawn Gerrain, who ultimately made the decision on the EE hire, "utilized a biased methodology when interviewing the candidates, subjecting Plaintiff to a more rigorous set of questions than she subjected [Dickinson]."  Dkt. No. 22-1, Pl.'s Mem. of Law at p. 10.  Lawrence's sole support for such conjecture is her own conclusory statements which fail to carry her ultimate burden of showing discrimination or at least showing a genuine issue of fact exists.  *Meiri v. Dacon*, 759 F.2d at 998.  Plaintiff has no direct evidence that Dickinson's interview with Gerrain was any different than her own.  Instead, in support of her claim that she was subjected to more rigorous questioning, Lawrence hones in on the fact that Gerrain provided little commentary

*-33-*

on Dickinson's score sheet.  Also, according to Plaintiff, the form on which Gerrain noted Lawrence's responses is entitled "Exec. Editor Interview Questions" while the form on which Gerrain noted Dickinson's responses is labeled "Acquisitions Editor Interview Questions." Lawrence Aff. at ¶ 21 (citing Basile Decl., Ex. K).  From this title discrepancy, Lawrence deduces that she was subjected to a more grueling set of questions while Dickinson was merely questioned as if she were being interviewed for her current position as an AE rather than the supervisory position of EE.  This gargantuan leap in logic hardly carries Plaintiff's burden of showing pretext.[18]

Were we to accept Plaintiff's version, we would similarly have to conclude that each of the ten other interviewers bore a similar bias towards Lawrence, as each of them gave Dickinson higher scores in almost every category.  Though Gerrain set the topics to be discussed at the interviews, each interviewer established his or her own set of questions, presumably centered around those topics that most affect their role with the new EE.  For example, Mark Howe testified that he developed his interview questions based upon the fifteen competencies listed on the scorecard, but, coming from a human resources standpoint, focused more on interpersonal and management type skills rather than, for example, editorial skills as there were other interviewers he deemed more competent to evaluate such skills.  Howe Dep. at p. 108, lines 19-23 & p. 109, lines 1-18; *see also* Dickinson Dep. at p. 22, lines 2-3 (testifying that each interviewer questioned her on matters related to "their positions and the impact that [the EE] role had on their positions").  To the extent Plaintiff claims the competencies on the scorecard or even an individual interviewer's particular line of questioning was inappropriately subjective and in this regard did not conform with the company's

---

[18] Notably, Dickinson's testimony at her deposition regarding the interview process she endured, in sum and substance, mirrored that of Lawrence's testimony.  *Compare* Lawrence Dep. at pp. 195-203 *with* Dickinson Dep. at pp. 19-24.

Affirmative Action Plan (AAP), we note that Plaintiff has not offered any affidavit from any member of the interviewing team which would connote or at least corroborate her hypothesis of why she was at a disadvantage from the inception, nor has she provided any detail as to the type of inquiries made that lend credence to her subjective questioning claim.  When you look at the scorecards side by side, each and every interviewer gave Dickinson a higher overall score than Lawrence;[19] thus, by a unanimous tally, Dickinson was deemed the more preferred, qualified candidate.  *See* Gerrain Aff., Ex. 4, Spreadsheet Tallies from Interviews.

In addition to the numerical scores, the interviewers had the opportunity to add comments to the evaluations.  *Id*. at ¶ 64.  Some of the interviewers expressed concerns regarding Plaintiff's grasp of the importance of not only hitting her signing goals, but also meeting her goals.  Gerrain Aff., Ex. 3.  With regard to the category of "Goal Achievement/Drive for Results," some of the interviewers commented as follows:

- "Zina understands that she needs to hit her signing goal but doesn't get that she needs to hit her sales/frontlist goals.  Felt that 86% hit rate on revisions was good."[20]
- "I do believe that Zina understands the importance of [goal achievement/drive for results] but what did concern me is that she did not seem to understand that one of her goals was driving her Frontlist and Topline sales.  Did not seem to recognize that Signing a product was only step one."
- "Zina reports that her new fronlist hit rate is 22% – far too low.  I am very concerned that her revision FL/HR is 53% which she characterized as 'not too bad.'  She is missing something regarding the basic management and setting of known revision goals and that she is not concerned about this does not suit her for an [EE] management role."

*Id*.

---

[19] In fact, when viewed side by side, in eleven different interviews, with scoring in fifteen different competencies, we noted very few incidences where a particular interviewer scored Lawrence higher than Dickinson in any given category.

[20] For the reader's edification, frontlist goals consist of products that publish within a given copyright year and topline goals are the total sales goals for a publishing program.  Lawrence Dep. at pp. 64-65.  Thomson sets a "frontlist hit list" for both first editions and subsequent edition revisions for publications, ranging from 60-70% of forecasted sales and between 115-120% for revisions.  *Id*. at p. 66.

*-35-*

A number of interviewers commented on Lawrence's understanding of the editorial process and how critical each group was to that process:

- "[Zina's response] made me question her understanding of the company's goals and needs as well as her understanding of the editorial precess as a whole."
- "The biggest area of concern for me and one that would greatly impact [Zina's] ability as an EE is that she seems to hold[] marketing at a high level of accountability well beyond what that role actual[ly] should be."
- "I was concerned to hear Zina report that the fact that DEs do not report to AEs presented a situation in which AEs have 'no control' over ensuring product success and timliness [sic] . . . AEs must find a way to inspire and excite a variety of people to deliver on-time, excellent material . . . . If Zina is missing this as an AE, I do not see how she could develop it in the larger, more demanding EE role."

*Id.*

Other remarks concerned Zina's accountability and ability to manage:

- "I don't see Zina managing her folks well or leading her group to excellence."
- "Zina is quick to blame and point fingers at others instead of taking accountability for her actions."
- "Zina has also never been in a management role and I question [whether] she has ample enough experience to manage an entire department."
- "My overall impression is that [Zina] lacks the experience and job maturity needed to successfully manage [] an entire SBU editorial program."
- "[Zina] seems to hold others more accountable."
- "Not much real experience; very people-focused vs. looking at what's needed from business perspective."
- "Based on our discussion, her accountability doesn't fit the [Thomson] culture."
- "Zina's responses to questions in this area were geared to management/process directions and not leadership/inspiration/motivation responses.  I am concerned about her ability to inspire and bring together individuals to 'do the impossible' as a team."
- "[Zina] would have difficulty leading/managing [AEs] when she has not demonstrated the skills nor had the success of signing original titles and seeing them through publication at [Thomson.]"

*Id.*

On the other hand, interviewers made the following comments with regard to Dickinson:

- "Sherry is more than capable of handling the [EE] position and excelling in this role after a year or so of experience."
- "Sherry has a strong understanding of the key issues to make a team successful and she is very focused on results."
- "Sherry presented a solid track record on goal achievement.  She was clear on signing,

revision, and sales goals and made it clear that she kept hers to the forefront in prioritizing time and work."

- "Sherry seems to have a strong work ethic and will hold herself accountable to the highest standards."
- "[Sherry] has signed and published original work while at [Thomson], far exceeded her sales and signing goals."
- "Sherry has a great reputation for her editorial achievements.  Sherry already has made her mark in goal achievement."
- "[Sherry] understands that she is in charge of a small business and it is her accountability to grow and show results for this 'business.'  With that understanding is also the understanding that she needs the support and expertise of others.  She sees and values the role of marketing and sales as part of her role and sees how there is a seamless synergy between the three functional groups on the team (production/editorial/marketing).  She sees the DEs and AEs as peers working toward the same goals."

*Id*.

Adding another gash to Lawrence's already sinking ship is the vacillating trajectory her testimony traverses.  As with her time barred failure to promote claim, *see supra* note 5, several inconsistencies present themselves in Lawrence's testimony.  Lawrence first testified that the only interviewer she questioned with regard to racial bias was Mark Howe.  Lawrence Dep. at p. 215, lines 19-23 & p. 216, lines 1-11 (testifying that no other interviewer had a racial animus towards her).  However, as her testimony progressed, she began to criticize other interviewers for a slew of reasons including personality quirks and improper questioning.  *See id.* at pp. 216-46 (testifying as to which interviewers were impartial including (1) John Young, who did not invest any time or energy in preparing for the interview and failed to ask her questions she felt would elicit vital information as to her qualifications for the job, (2) Tim O'Leary, who inappropriately remarked his surprise/praise of how much Lawrence accomplished against the odds she faced, which she took to be a reference to overcoming an obstacle being an African-American woman in her field (a comment Lawrence deemed inappropriate though she never made any complaints to anyone in Thomson), (3) Gayle Murray, who emphasized the conflict Lawrence would face with her commitment to work and

commitment to her young children, which Lawrence believed was racially motivated as if she as an African-American woman would make choices about her children different than a white woman, and (4) Dawn Gerrain, who prejudged who she preferred in the EE position).  After further probing, Lawrence's convoluted testimony came full circle when she proclaimed that the individual interviewers gave her a low rating <u>because</u> of her race.  *Id*. at p. 245, lines 19-21.  In effect, it is Lawrence's contention that these interviewers pre-judged her, or at least were aware of Gerrain's preference of hiring Dickinson, and that race is the only plausible explanation for such predeterminations.  As proof of her *fait accompli*, Lawrence presents only her conclusory statements and testimony premised upon inadmissible hearsay evidence; none of which can be utilized to avert summary judgment.[21]

Lawrence also proclaims she was more qualified for the position because she worked her entire career with Thomson in the Career Education Unit whereas Dickinson worked in another unit and had less familiarity.  Lawrence Aff. at ¶ 22.  Though in some circumstances, evidence of superior qualifications could suffice to show pretext, Plaintiff has failed to submit any evidence beyond her own speculation that she was more qualified for the position than Dickinson.  *See Ash v. Tyson Foods, Inc.*, 546 U.S. 454 (2006) (cited in *Caidor v. Onondaga County*, 2006 WL 2595202, at *7 (N.D.N.Y. Sept. 11, 2006)).  When viewing both candidates' resumes, by any test, it is not readily apparent that Lawrence was more qualified than Dickinson for the promotion and Lawrence's speculation and conjecture is insufficient to carry her ultimate burden of showing discrimination.  Gerrain Aff., Ex. 2, Dickinson's and Lawrence's Resumes.  Furthermore, "the court

---

[21] Through inadmissible hearsay evidence, Lawrence explained her conjecture as to why Dickinson and not she was slated to get the position; interestingly enough, such hearsay does not cite nor infer race as the proffered explanation for Gerrain's pre-judment.  Lawrence Dep. at pp. 222-23.

must respect the employer's unfettered discretion to choose among qualified candidates." *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d at 103 (citation omitted); *see also Simms v. Oklahoma ex rel. Dep't of Mental Health and Substance Abuse Servs.*, 165 F.3d 1321, 1330 (10th Cir. 1999) (quoted in *Byrnie*) ("Our role is to prevent unlawful hiring practices, not to act as a super personnel department that second guesses employers' business judgments.") (internal quotation marks and citations omitted).   Even if we were to draw an inference from Lawrence's evidence that indeed the decision of whom to promote was pre-determined, there is no evidence that such pre-determination was based at all on racial considerations.   *See supra* note 21.   Absent some evidence of discrimination, a court should "refrain from intruding into an employer's policy apparatus or second-guessing a business's decisionmaking process." *Meiri v. Dacon*, 759 F.2d 989, 995 (2d Cir. 1985) (citation omitted).

    In vigorously defending her cause of action, Plaintiff urges denial of Defendant's Motion asserting that Defendant failed to present objective or competent evidence for its failure to promote the Plaintiff.   We disagree.   The interview scorecards with written comments combined with Plaintiff's own testimony that she was able to ask questions at the interviews and was satisfied with the answers she received, Lawrence Dep. at p. 203, lines 12-15, is more than enough evidence not only to defeat any presumption raised by Lawrence's *prima facie* case, but to also withstand any of Lawrence's subjective and conclusory statements that discrimination was afoot.   Since Plaintiff fails to show that Thomson's "proffered explanation is unworthy of credence[,]" summary judgment on Plaintiff's claim of discrimination with regard to the failure to promote is **granted** and the claim is **dismissed**.   *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981).

### 2.  Discipline

Lawrence claims that the verbal and written warnings she received in March 2003 were racially motivated.  To establish a *prima facie* case of discriminatory employment discipline, a plaintiff must show: "(1) membership in a protected group; (2) qualification for a position; (3) an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discrimination." *Brown v. Middaugh*, 41 F. Supp. 2d 172, 183-84 (N.D.N.Y. 1999) (citing *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 63 (2d Cir. 1997)).

Unlike Defendant's prior complacency with regard to Lawrence's failure to promote claim, Defendant repugns Plaintiff's ability to establish a *prima facie* case of discriminatory discipline. We agree that Plaintiff fails to adequately unveil her *de minimis* burden.  Regardless of establishing a *prima facie* case, this discrimination claim nevertheless suffers the same doom as her prior one since Plaintiff cannot sustain her ultimate burden of showing pretext or that the discipline occurred under circumstances giving rise to an inference of discrimination.

No one contests Plaintiff's ability to meet prong one – as an African-American woman, she clearly falls within a protected class.  With regard to the second element, in presenting her qualification for her position, Lawrence "need not demonstrate that [her] performance was flawless or superior.  Rather, [s]he need only demonstrate that [s]he possesses the basic skills necessary for performance of [the] job." *de la Cruz v. New York City Human Res. Admin. Dep't of Soc. Servs.*, 82 F.3d 16, 20-21 (2d Cir. 1996) (internal quotation marks and citation omitted); *Garrett v. Garden City Hotel, Inc.*, 2007 WL 1174891, at *13 n.8 (E.D.N.Y. Apr. 19, 2007) (quoting *de la Cruz* and noting that although plaintiff's proof on the issue of satisfactory job performance was "thin," given

the *de minimis* burden at the *prima facie* stage, plaintiff satisfies the second element). There does not appear to be any dispute that Plaintiff possessed the skills necessary for the AE position. Indeed, Defendant conceded that job performance was not the basis for Lawrence's discipline. Dickinson Dep. at pp. 159-60 (discussion on the record between the attorneys wherein Defendant's attorney states, "there's no claim, as I understand it, that performance was the basis for [Lawrence's] termination and/or discipline"). Instead, Defendant contends it was Lawrence's behavioral issues that resulted in her discipline and Thomson's legitimate expectations of Lawrence included her attitude and treatment of her supervisors. Though she may have received some negative evaluations, Defendants have not alleged that Plaintiff was unqualified for her job. Thus, notwithstanding Defendant's contestation, drawing all reasonable inferences in favor of Plaintiff, it appears on the evidence presented she meets the second prong of her *prima facie* case of discrimination. *See Hill v. Rayboy-Brauestein*, 467 F. Supp. 2d 336, 351 (S.D.N.Y. 2006) (citing *de la Cruz v. New York City Human Res. Admin. Dep't of Soc. Servs.*, 82 F.3d at 20-21, for the proposition that despite plaintiff's poor performance evaluations, defendants did not allege plaintiff was unqualified for her job and thus she meets her minimal burden).

Similarly, with regard to the fourth prong, Plaintiff must present evidence of circumstances surrounding her discipline that give rise to an inference of discrimination. If we draw all reasonable inferences in favor of Plaintiff and believe that her version of events are correct, then we may affirmatively state that she meets her burden here by showing that in presenting Lawrence with the written warning, Dickinson called her a scary person. Though overt racial undertones may be lacking, *see infra* p. 45, for purposes of the *prima facie* case, it suffices.

Whether the third prong is met is not so readily apparent. As the Second Circuit explained,

for purposes of a discrimination claim, "[a] plaintiff sustains an adverse employment action if he or she endures a materially adverse change in the terms and conditions of employment." *Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000) (internal quotation marks and citations omitted).   While there is no bright-line rule as to what constitutes an adverse employment action, the Second Circuit has held that in order to qualify as "materially adverse," the plaintiff's working conditions must undergo a change "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Id*.   Examples of employment actions deemed sufficiently disadvantageous to constitute an adverse change include "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation." *Id*. (quoted in *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 128 (2d Cir. 2004)); *see also Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998) ("A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.").

In the instant case, the written and verbal warnings Lawrence received did not constitute a significant change in her employment status nor were they in any way materially adverse. *Carmellino v. Dist. 20 of New York City Dep't of Educ.*, 2006 WL 2583019, at *3 (S.D.N.Y. Sept. 6, 2006) (a negative performance evaluation alone does not constitute adverse employment action) (citing *Weeks v. New York State Div. of Parole*, 273 F.3d 76, 86 (2d Cir. 2001), *abrogated on other grounds*, *Nat'l R.R. Passengers Corp. v. Morgan*, 536 U.S. 101 (2002)); *Stembridge v. City of New York*, 88 F. Supp. 2d 276 (S.D.N.Y. 2000) (no actionable harm where "reprimand contained a warning that repetition of improper behavior could result in disciplinary action but contained no

indication of any planned discipline or further action"). Lawrence was simply reprimanded for what her supervisor deemed to be insubordinate actions or statements. Lawrence may have disagreed with the underlying basis for the warnings and may have felt disappointed about such rebuke, but her disagreement and dissatisfaction are unavailing. *See Castro v. New York City Bd. of Educ. Personnel*, 1998 WL 108004, at *7 (S.D.N.Y. Mar. 12, 1998) ("[A]lthough reprimands and close monitoring may cause an employee embarrassment or anxiety, such intangible consequences are not materially adverse alterations of employment conditions."). Her job responsibilities and working conditions remained the same. Ergo, Plaintiff fails to set forth a *prima facie* case of discriminatory discipline. Because she fails to carry her initial *McDonnell Douglas* burden, we need not explore Defendant's legitimate, non-discriminatory reason for disciplining Lawrence.

Nevertheless, were we to assume that Plaintiff states a *prima facie* case of discrimination, the end result remains. Under the burden-shifting test, Defendant has come forward with a legitimate, non-discriminatory reason for Lawrence's discipline – her perceived insubordination – while Lawrence has failed to present any evidence to show pretext.

After Dickinson assumed her new role as EE, a series of events and/or interactions, some contested, took place provoking a discord, though minimal, between Lawrence and Dickinson. These interactions laid the foundation of what Dickinson perceived as behavioral issues. While some of the earlier, less serious infractions were pretermitted, ultimately, Lawrence was reprimanded for her cumulative, inappropriate and insubordinate behavior. We need not delve into matters of credibility and employer intent or state-of-mind since the emails and written warning speak for themselves. The string of emails on the pricing decrease issue was the "last straw" for Dickinson who issued a written warning to Lawrence detailing the actions which were deemed

inappropriate and/or insubordinate, including, but not limited to:

1) Lawrence's email, dated March 24, 2003, responding to Dickinson's request that all AEs update their monthly report to include information about Advisory Boards, wherein Lawrence states "the beauty of submitting my monthly report by the 20th of each month is that it allows . . . ample time to prepare our team report. The pitfall of a 20th submission date is that information requested after that date needs to be incorporated into an already completed report. **In the interest of time-management, I would prefer to prepare and submit my monthly report only once per month."**

2) Lawrence's emails, dated March 21, 20, 19, & 14, 2003, regarding the price reduction issue, in responding to Dickinson's request for justification, Lawrence stated :

   • "**I neither have the inclination or the authority to unilaterally remove any tasks from my plate. Furthermore, there has never been a task put before me that I fail to do because 'I don't want to'.**"

   • "I very much want you to be assured that I know the basic expectations of my job and that I will continue to fulfill them to the best of my ability. There are several tasks that require my attention and I have seen it as my responsibility to prioritize these tasks with my list development goals in mind. **If you would like me to discontinue acting in this capacity, please let me know – at that time I will begin preparing a weekly or, if you prefer, a daily task list for your approval**."

   • "I do not wish to speak for Nigar however **I am dropping this because of the work**. It is imperative that I manage my time effectively if I am to succeed with my list development goals – a significant part of that management is prioritizing my task lists. Although I do believe the price decreases I requested are in the best interest of the individual titles and my list as a whole, my other responsibilities take precedence."

   • "**Please note that I will not pursue price decreases for the aforementioned titles**."

   • "**I feel that the amount of date collection and feedback needed to process price decreases is prohibitive – I will refrain from doing so in the future and will simply pass feedback/comments I receive regarding pricing issues directly to you and Donna**."

   • "I would very much like to fill you in on this situation and then ask you to take it from here – **This is very much an example of the push back that I have neither the time nor inclination to address with Donna**. Of course I will focus my time here if directed to do so."

3) Lawrence's email, dated March 24, 2003, responding to Dickinson's notification about office changes impacting several members of the team, including Dickinson, wherein Lawrence states, "**I am obviously not going to be given a choice about this so, 'so be it'**. Please let me know when this change is scheduled to take place as I have several personal items in my office that I will need to take care of."

Gerrain Aff., Ex. 5 (emphasis added).

The only proof Lawrence presents to rebut Defendant's non-discriminatory explanation and establish that racial animus was the true driving force behind the warnings is her contestation that Dickinson called her a "scary person" when Lawrence questioned why she did not come to speak with Lawrence first. According to Lawrence, "the use of the word 'scary' to characterize African-Americans has recently been utilized by the [rap] artist Fifty Cent in one of his songs."[22] Lawrence Aff. at ¶ 12. At her deposition, Lawrence admitted that Caucasians can be "scary people" as well and that it is her belief that the statement was motivated by racial animus because it was said to her. Lawrence Dep. at pp. 31-34. Dickinson, of course, vociferously disclaims such motivation and explains that the true context of her statement arose when Lawrence asked her why a Human Resources representative was present at their meeting, to which Dickinson retorted she was afraid to speak with Lawrence alone given the communication issues between them. It is not for this Court to decide which perspective is the unerring transpiration and we need not engage in such speculation. While this statement may have been enough to get Plaintiff past her minimal burden in establishing a *prima facie* case, the strength of such statement as denoting racial animus is feeble at best and simply insufficient to establish pretext, especially when viewing the magnitude of the evidence presented by Defendant validating the warnings.

At all times relevant to the allegations set forth in Lawrence's Complaint, Thomson had a Handbook that addressed, among other things, professional conduct. Howe Aff., Ex. 1. Lawrence received a copy of the Handbook and signed for it. Howe Aff. at ¶ 2; Lawrence Dep. at p. 67, lines 13-16. Insubordination and/or lack of cooperation with a supervisor or co-worker including refusal

---

[22] We are bemused by Lawrence's reference to rapper Fifty Cent a/k/a "Fiddy" as an iconic cultural commentator on race polemics and recitation of his invariant insights into the racial connotation of "scary people." While Lawrence haphazardly accepts as cogent discourse this "insightful troubadour's" rants on the matter of race, we find such reference unpersuasive.

or unreasonable delay in carrying out instructions is a violation of the Handbook with which Lawrence was bound to comply.  Howe Aff., Ex. 1.  Lack of cooperation with a supervisor is inappropriate professional conduct.  *Id*.  Indeed, Plaintiff admits that as her supervisor, Dickinson had the authority to discipline Lawrence if she felt her behavior was "inappropriate."  Lawrence Dep. at p. 349.  The written warning is replete with statements which Dickinson, as a supervisor, had every right to find inappropriate or insubordinate.  Again, Plaintiff may disagree with or intensely dislike the stated reasons underlying the discipline, but that does not translate into discrimination.  Similarly, with regard to the verbal warning Lawrence received days later, Lawrence fails to denote that such warning was issued under circumstances evincing discriminatory animus.  Dickinson issued the verbal warning because Lawrence brought work into a team building event without first obtaining Dickinson's permission and then at a break after already being reprimanded, Lawrence discussed her salary in the presence of other employees.  While Lawrence provides seemingly plausible explanations for her behavior, she does not contest the fact that she did indeed engage in such behavior.  Once again, she simply disagrees that her behavior warranted disciplinary action.  But such disagreement does not provide an inference that race played any role in Dickinson's decision to chide Lawrence.  Our task at hand is not to assess the appropriateness of Thomson's employment decisions, but rather to determine whether Lawrence raises a genuine issue of fact as to whether such decisions were based upon racial animus.  Lawrence must come forward with something more to allow a rational finder of fact to at least draw the inference of discrimination.  No such evidence or circumstance has been presented.

Accordingly, since Plaintiff fails to carry her initial and ultimate burdens of proof in showing that Thomson's "proffered explanation is unworthy of credence" and that race was the true motive

for her discipline, summary judgment on Plaintiff's claim of discriminatory discipline is **granted** and the claim is **dismissed**. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981).

### 3. Termination

In June 2003, after considerable time had elapsed since the March 2003 warnings, the Hanie-Rockett Funding incident unfolded, ultimately leading to the termination of Lawrence's at-will employment. Thomson asserts that Lawrence's white-out change of the Funding without bringing it to a supervisor's attention was deceitful and was the culmination of a series of inappropriate behavior, some of which resulted in the issuance of written and verbal warnings. Lawrence contends she did not act contrary to any company procedure nor did she attempt to cover-up her alterations to the Funding document and thus, Defendant's proffered reason for termination is merely a pretext for racial discrimination.

To establish a *prima facie* case of discriminatory discharge, Plaintiff must show "(1) that [s]he belongs to a protected class, (2) that [s]he was performing [her] duties satisfactorily, (3) that [s]he was discharged, and (4) that [her] discharge occurred in circumstances giving rise to an inference of discrimination on the basis of [her] membership in that class." *McLee v. Chrysler Corp.*, 109 F.3d 130, 134 (2d Cir. 1997); *see also Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 567 (2d Cir. 2000).

Here, Lawrence easily satisfies prongs one and three since she is an African-American woman who was terminated from employment. Establishing prong two poses the same dilemma Lawrence faced with her discriminatory discipline claim, that is, producing evidence evincing her qualification for her job and/or Thomson's satisfaction with her job performance. Nevertheless, as with her discriminatory discipline claim, we find that Plaintiff meets her initial burden by showing

*-47-*

that she was at least qualified for the AE position.  Whether she was performing her job to Defendant's satisfaction is an issue we shall deal with later.  For now, Plaintiff must still overcome one last hurdle before the burden of production shifts to the Defendant – she must show that her discharge occurred under circumstances giving rise to an inference of discrimination.  In assessing this last prong, the Court must determine "whether the proffered admissible evidence shows circumstances that would be sufficient to permit a rational finder of fact to infer a discriminatory motive."  *McLee v. Chrysler Corp.*, 109 F.3d 130, 135 (2d Cir. 1997).

Lawrence asserts that an inference of discrimination is present since she believed her actions were legitimate as she had never been notified either in writing or orally that changing an author on a Funding was against company protocol.  She also presents evidence of favorable performance reviews, yearly raises, and other performance bonuses she received.  Lastly, Lawrence draws attention to the racial makeup of Thomson's employees wherein she was the only African-American AE, one of only two to three African-American employees in the Publishing Unit, and she was not replaced by an African-American individual.  Howe Dep. at pp. 49-50; Gerrain Dep. at pp. 250-53. Notwithstanding the former proffers, evidence that Lawrence was replaced by a person outside the protected class may give rise to an inference of discrimination.  *See Meiri v. Dacon*, 759 F.2d 989, 996 (2d Cir. 1985) (noting that it is improper and perhaps too onerous a burden to require a plaintiff to show he or she was replaced by a member outside the protected class, but such fact could give rise to an inference of discrimination); *Carter v. AT&T Commc'n*, 759 F. Supp. 155, 159 (S.D.N.Y. 1991) (though Title VII does not require proof of non-protected member replacement, it nevertheless supports an inference of discrimination).  Thus, this contention alone suffices to raise an inference of discrimination shifting the burden to Thomson.

*-48-*

"To a large extent, of course, the strength or weakness of the inference of discrimination created by the employee's *prima facie* case defines the nature of the employee's rebuttal." *Meiri v. Dacon*, 759 F.2d at 997.  Defendant contends Lawrence was discharged from employment due to her improper behavior, including various emails, whiting out of an approved author, and other behavioral issues.  "Any legitimate, non-discriminatory reason will rebut the presumption triggered by the *prima facie* case.  The defendant need not persuade the court that it was actually motivated by the proffered reasons."  *Griffin v. Ambika Corp.*, 103 F. Supp. 2d 297, 307 (S.D.N.Y. 2000) (quoting *Fisher v. Vassar College*, 114 F.3d 1332, 1335-36 (2d Cir. 1997)).  We find that Defendant succinctly states and adequately supports a legitimate, non-discriminatory reason for Lawrence's termination and any presumption of discrimination falls by the wayside.  The burden now shifts back to Plaintiff to show Defendant's pellucid reason is pretextual.

In an attempt to bolster her claim of pretext, Lawrence again avers she was unaware that re-obtaining funding approval for a new author was required when a substitution is made prior to contract.  Since there was no overt company protocol interdicting her actions, nor any set protocol explaining what to do in such circumstance, Lawrence contends that Defendant's stated reason for her discharge is pretextual and the only plausible explanation for her discharge, in light of her overall favorable job performance ratings, was racial animus.  Lawrence asks the Court to give preclusive effect to the conclusion made by an Administrative Law Judge (ALJ) with the New York State Unemployment Insurance Appeal Board that Lawrence's discharge was not under circumstances evidencing misconduct and therefore did not disqualify her from obtaining

unemployment benefits.[23]  The ALJ found that because Lawrence had not been previously advised that her actions were impermissible and had never been warned in that regard, her isolated incident leading to discharge cannot be categorized as misconduct for purposes of disqualifying her from receiving unemployment benefits.[24]  Lawrence Aff., Ex. D, Admin. Law Judge Decision in NYS Unemployment Ins. Benefits Case, dated Sept. 15, 2003.

Without citing any case law, Plaintiff attempts to distinguish her aspiration to have preclusive effect given to the ALJ's findings from the long line of Title VII cases wherein courts deem it against public policy for **employers** to seek preclusive effect of unreviewed agency determinations.  The underlying rational for such proscription is that if employers were allowed to seek preclusive effect from agency determinations, then literally all plaintiffs would be precluded from seeking relief under Title VII cases as a court could simply give the EEOC's "lack of probable cause" determination preclusive effect.  Obviously, this is in direct contravention to congressional intent to provide an independent avenue of redress for legitimate claims of discrimination.  *See Univ. of Tennessee v. Elliott*, 478 U.S. 788, 795-99 (1986) (finding that the express language of Title VII

_____

[23] As the ALJ explained in Lawrence's unemployment benefits appeal, "a claimant is disqualified from receiving [unemployment] benefits after having lost employment through misconduct in connection with that employment." Lawrence Aff., Ex. D, Admin. Law Judge Decision in NYS Unemployment Ins. Benefits Case, dated Sept. 15, 2003 (citing N.Y. LAB. LAW § 593(3)).

[24] Specifically, the ALJ stated:

The credible evidence establishes that the claimant was discharged because she substituted an author on a project that had approved funding, without obtaining funding anew for the different author.  The claimant's testimony that she was not aware that her actions were impermissible is credible and accepted.  The claimant has satisfactorily explained the reasons for her actions.  It is noted that she was never specifically warned in regard to same.  I find that this was an isolated incident which was not detrimental to the employer's interests, further noting the employer plans to complete the project with the substitute author procured by the claimant.  Although it was the employer's prerogative to discharge the claimant, there is no indication that the claimant's [actions] were calculated to deceive the employer or to wrongfully benefit herself.  Accordingly, it is concluded that the claimant's employment ended under non-disqualifying conditions.

Lawrence Aff., Ex. D.

directs only "substantial weight" be given to state administrative agency decisions and concluding that "Congress did not intend unreviewed state administrative proceedings to have preclusive effect on Title VII claims").[25]  Lawrence, however, contends she is not similarly situated because the cases proscribe only an ***employer's*** use of preclusion, while permitting her a loophole as an ***employee*** to seek issue preclusion which, in her estimation, "would further the goal behind both finality of decisions where all the necessary criteria for collateral estoppel are met, and the purpose of the congressional intent of Title VII to protect individuals."  Pl.'s Mem. of Law at p. 13.

The Court is not swayed by Plaintiff's thesis nor do we endorse her attempt to utilize the preclusion doctrine as both a sword and a shield.[26]  Based upon clear Supreme Court and Second Circuit precedent, we agree with Defendant's assessment that since the ALJ's findings were never

---

[25] In *Univ. of Tennessee v. Elliott*, the Supreme Court explained that in Title VII cases, unreviewed state agency determinations stand on a "different footing" than state court judgments wherein the latter are governed by the preclusion principles set forth in 28 U.S.C. § 1738 while the former are not.  478 U.S. at 792, n.3, & 794-95 (citing *Kremer v. Chemical Construction Corp.*, 456 U.S. 461 (1982), and further noting that the development of administrative agencies antedates § 1738 and therefore agency determinations are not covered by this statute which governs preclusive effect of state court judgments and records).  After reviewing its own precedents, the plain language of Title VII, and the legislative history, the Court concluded that applying a common law preclusion rule to unreviewed state agency determinations is incompatible with Title VII's purpose in providing a trial *de novo* in federal court.  *Id.* at 795-96.  Notably, however, the Court instituted a delineation with regard to preclusive effect in civil rights actions, such as those brought pursuant to 42 U.S.C. § 1983, and found that nothing in the Reconstruction civil rights statutes nor legislative history indicates that Congress intended to "contravene the common-law rules of preclusion . . . [or] repeal or restrict the traditional doctrines of preclusion."  *Id.* at 797 (quoting *Allen v. McCurry*, 449 U.S. 90, 97-98 (1980)).  Thus, contrary to the anti-preclusion rule established for Title VII cases, the Court held that in § 1983 actions, where a state agency "acting in a judicial capacity . . . resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate . . . federal courts must give the agency's factfinding the same preclusive effect to which it would be entitled in the State's courts."  *Id.* at 799 (internal quotation marks and citation omitted).

[26] We find that Lawrence's supposition that she can select which ALJ statement the Court should give preclusive effect to is motivated by self-interest and not a rational rule of law.  She certainly does not suggest this Court should give preclusive effect to the ALJ's statement that "it was the employer's prerogative to discharge the claimant" or NYSHRD's finding of "no probable cause" on her discrimination claims, yet, she incredulously asks for an inference of racial discrimination to be drawn from the fact that she was not denied unemployment benefits.  Notably, were we to institute a collateral estoppel analysis, we inevitably would find that the ALJ's determination that Plaintiff was not fired for misconduct is not the issue before this Court, nor was the issue of racial motivation properly before the ALJ.  Stated another way, not finding Lawrence deceitful is not preclusive on whether Thomson had a legitimate, non-discriminatory basis to terminate her.  *See, e.g.*, *Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir. 1998) (citations omitted) (noting that integral to the application of collateral estoppel is that "identical issues" were raised in a previous proceeding).

appealed through the state courts, no preclusive effect is possible.  *See Univ. of Tennessee v. Elliott*, 478 U.S. at 796; *Raniola v. Bratton*, 243 F.3d 610, 624 (2d Cir. 2001); *Gonzalez v. New York City Transit Auth.*, 2001 WL 492448, at *9 (S.D.N.Y. May 9, 2001) ("[I]t has been well established for over ten years that an unreviewed state administrative determination does not preclude *de novo* federal court consideration of a Title VII claim[.]").  Thus, whether Plaintiff can carry her ultimate burden of showing pretext will be judged on its own merit and not based upon any prior, un-reviewed agency determination.

In refuting Thomson's stated reason for her discharge, or at least in presenting evidence to allow a reasonable juror to deduce that the stated reason is a pretext, we note that Lawrence's "burden is more difficult [since Thomson] substantiates . . . a sound and factually supported basis [for] its neutral reason for terminating her."  *Duprey v. Prudential Ins. Co. of Am.*, 910 F. Supp. 879, 888 (N.D.N.Y. 1996) (internal quotation marks and citation omitted).

Lawrence contends that Thomson's failure to communicate to her that she could not change an author on a Funding lends credence to the fact that she did nothing wrong.  In her estimation, because there was no violation of any stated rule, practice, or policy, the reason proposed for her termination is undermined.  But Plaintiff's claimed ignorance of company protocol does not vitiate its legitimacy, nor does it allow for an inference that race motivated Thomson's employment decision.  The fact remains that Thomson terminated Lawrence's at-will employment because it perceived Lawrence's actions to be deceitful.  According to Thomson's Employee Handbook, inappropriate conduct with regard to performance, violations of company policies, or disregard for the company's interests may result in corrective action up to and including termination of employment.  Howe Aff., Ex. 1.  Examples of unacceptable and inappropriate behavior include, but

are not limited to, falsification of timekeeping or other company records or documents or dishonesty in any form as well as insubordination and/or lack of cooperation with supervisors, or co-workers, including refusal, or unreasonable delay, in carrying out instructions.  *Id*.  Also, pursuant to Thomson's Code of Business Conduct and Ethics, an employee should "never falsify any document or distort the facts relating to a particular transaction."  Howe Aff., Ex. 3, Thomson Code of Business Conduct and Ethics).

Whether Plaintiff was actually deceitful or whether she actually violated some company policy is not for this Court to decide.  It is Plaintiff's responsibility to put forth some evidence to show her termination occurred under circumstances giving rise to an inference of discrimination. What we are left with is Lawrence's own conclusions as to the true reason for her termination.  But simply concluding that the proffered reason is untrue does not translate, without more, into an inference of discriminatory animus.  Courts "must . . . carefully distinguish between evidence that allows for a reasonable inference of discrimination and evidence that gives rise to mere speculation and conjecture. . . . An inference is not a suspicion or guess."  *Bickerstaff v. Vassar College*, 196 F.3d 435, 448 (2d Cir. 1999) (internal quotation marks and citations omitted) (quoted in *Pamphile v. Tishman Speyers Prop., L.P.*, 2006 WL 1806505, at *5 (E.D.N.Y. June 29, 2006)).  Plaintiff may not base  her evidence on conclusory assumptions; such would be insufficient to support an inference of discrimination.  *Hawana v. City of New York*, 230 F. Supp. 2d 518, 528 (S.D.N.Y. 2002) (citations omitted).

In further support of her pretext argument, Plaintiff chastises Defendant for its failure to cite other instances where another employee was disciplined or terminated for replacing an author on a approved Funding.  Pl.'s Mem. of Law at p. 9.  One mode of showing pretext is demonstrating that

similarly situated employees were treated differently. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804 (1973).  But it is the Plaintiff's burden to produce evidence of disparate treatment, not Defendant's.  *See Henry v. Daytop Village, Inc.*, 42 F.3d 89, 96-97 (2d Cir. 1994) (noting plaintiff failed to "adduce evidence sufficient to create a genuine issue about whether [a pattern of disparate treatment based on race or gender] was present").  In any event, both Howe and Gerrain testified that Thomson is unaware of encountering a situation where an AE changed a pre-approved Funding without refunding it or communicating it to a supervisor.  Howe Aff. at ¶ 17; Gerrain Aff. at ¶ 53.  The only incident anyone could recall was when one other employee, a Caucasian-male AE, was terminated for his deceitful behavior concerning a Funding. Gerrain Aff. at ¶ 53, n.1; *see also* Basile Decl., Ex. G, Def.'s Resp. to Pl.'s Request for Produc. of Docs.  Though admittedly this situation is not analogous to Lawrence's, again we iterate, it is Lawrence's burden to produce evidence of disparate treatment.  Lawrence simply contends that an unnamed Caucasian-female AE made a number of changes to approved Fundings without re-submitting or notifying a supervisor and she was not disciplined.  Lawrence Aff. at ¶ 18.  But Lawrence does not elaborate further on the specifics of such changes.  Her conclusory statement of disparate treatment appears to be based on nothing more than speculation and conjecture and is simply insufficient to create a genuine issue of material fact.

Also in support of her pretext argument, Plaintiff protests that her earlier discipline was inappropriately administered and that prior to Dickinson assuming the EE position, Plaintiff had been lauded in her annual performance reviews.  "The mere fact that an employee disagrees with her employer's assessments of her work, however, cannot standing on its own show that her employer's asserted reason for termination was pretextual." *Ricks v. Conde Nast Pub., Inc.*, 92 F.

Supp. 2d 338, 347 (S.D.N.Y. 2000) (citation omitted) (quoted in *Garrett v. Garden City Hotel, Inc.*, 2007 WL 1174891, at *14 (Apr. 19, 2007) (rejecting plaintiff's attempt to rebut the employer's proffered explanation by "generally disputing the accuracy of her supervisors' assessments, and providing her own contrary appraisal of her work")); *see also McLee v. Chrysler Corp.*, 109 F.3d 130, 135 (2d Cir. 1997) (finding summary judgment appropriate where plaintiff's "disputations [of his employer's proffered explanations] were rationalizations for his deficiencies rather than demonstrations of any genuine issue of material fact to be tried") (quoted in *Garrett*).   Furthermore, evidence of prior good evaluations is insufficient on its own to show that discharge was the product of discrimination.  *Garrett v. Garden City Hotel, Inc.*, 2007 WL 1174891, at *14 (collecting cases including *Brown v. Soc. for Seaman's Children*, 194 F. Supp. 2d 182, 192 (E.D.N.Y. 2002) (plaintiff's submission of good evaluations received "does not tend to show that her discharge was the product of discrimination"); *Brinson v. New York City Transit Auth.*, 60 F. Supp. 2d 23, 29 (E.D.N.Y. 1999) (evidence of prior good evaluations "fail[s] to dispute the existence of plaintiff's extensive record of warnings, reprimands and suspensions so as to create a genuine issue of fact regarding her job performance"); & *Taylor v. Polygram Rec.*, 1999 WL 124456, at *14 (S.D.N.Y. Mar. 8, 1999) ("The fact that [plaintiff] may have received prior positive evaluations cannot in itself demonstrate that her later negative evaluations, and the concomitant proffered explanation, are unworthy of credence.")).

Plaintiff's arguments raise issues, at best, as to the wisdom of Thomson's decision to terminate her, but do not demonstrate that the stated reason for termination was a pretext.  When a plaintiff fails to "rebut specific, credible evidence offered in support of an employer's articulated reason for [termination, the plaintiff] cannot maintain claims that [his or her] firing [was

discriminatory." *Griffin v. Ambika Corp.*, 103 F. Supp. 2d at 310 (quoting, *inter alia*, *Bickerstaff v. Vassar College*, 196 F.3d at 451-52). Whether Thomson made a sound business judgment is beyond Title VII's purview. *Davidson v. Time Inc.*, 972 F. Supp. 148, 153 (E.D.N.Y. 1997) (noting that Title VII "may not be used as a vehicle for second-guessing an employer's business judgment."); *see also Dale v. Chicago Tribune Co.*, 797 F.2d 458, 464 (7th Cir. 1986) ("This Court does not sit as a super-personnel department that reexamines an entity's business decisions.") (quoted in *Scaria v. Rubin*, 117 F.3d 652, 654-55 (2d Cir. 1997)). This Court's only concern is not whether the termination was for an inexpedient reason, but whether it was based on an improper discriminatory reason. *See, e.g.*, *Dister v. Cont'l Group, Inc.*, 859 F.2d 1108, 1116 (2d Cir. 1988) ("Evidence that an employer made a poor business judgment in discharging an employee generally is insufficient to establish a genuine issue of fact as to the credibility of the employer's reasons."); *Duprey v. Prudential Ins. Co. of Am.*, 910 F. Supp. at 888 (citing, *inter alia*, *Dister*).

Ultimately we find that Plaintiff fails to carry her burden in showing that her discharge arose under circumstances giving rise to an inference of discrimination.[27] *McLee v. Chrysler Corp.*, 109 F.3d at 135-37 (no inference of discriminatory motive where plaintiff's own words and actions confirmed defendant's legitimate, non-discriminatory reason for termination, namely, poor job

---

[27] We are unsure as to whether Lawrence contends that Dickinson's "scary person" remark evidences or provides an inference that Dickinson played a role in the decision to discharge her. To that end, we note that an inference of discriminatory discharge may be shown through evidence of discriminatory statements, but only "when a plaintiff demonstrates that a nexus exists between them and a defendant's adverse employment decision." *Stepheny v. Brooklyn Hebrew School for Special Children*, 356 F. Supp. 2d 248, 259 (E.D.N.Y. 2005) (internal quotation marks, citations, and alteration omitted). Dickinson's alleged "scary person" remark is the sole remark deemed by Plaintiff to connote racial animus. However, stray remarks, without more, "even if made by a decisionmaker, do not constitute sufficient evidence to make out a case of employment discrimination." *Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 56 (2d Cir. 1998); *see also Tomassi v. Insignia Fin. Group, Inc.*, 478 F.3d 111, 115-16 (2d Cir. 2007). To the extent Dickinson played any role in the decision to terminate Lawrence, it cannot be said that her "scary person" statement uttered in March 2003 had a sufficient nexus to Lawrence's termination in June 2003, especially considering both Lawrence and Dickinson agree that post-written and verbal warnings, their working relationship was relatively conciliative, or rather unblemished by any tension.

performance); *Garrett v. Garden City Hotel, Inc.*, 2007 WL 1174891, at *15-17 (when considered in the context of the case as a whole, remarks to "fire that black bitch" and discussing the application of a race-based "look test" to reject an African- American job applicant, if made at all, were stated too remotely from date of the adverse action and were not made by individuals who evaluated plaintiff or discharged her); *Pamphile v. Tishman v. Speyers Prop., L.P.*, 2006 WL 1806505, at *5-6 (E.D.N.Y. June 29, 2006) (plaintiff failed to present evidence beyond his own beliefs and inadmissible hearsay to create a genuine issue of material fact); *Griffin v. Ambika Corp.*, 103 F. Supp. 2d at 308-09 (African-American salon employees failed to present any evidence to contradict defendant-employer's assertions of their poor performance and to counter that the reason for their discharge was their rude and inappropriate behavior, not race).[28]  As such, summary judgment is **granted** and Lawrence's claim of discriminatory discharge is **dismissed**.

## E.  Retaliation

Lawrence asserts that Defendant violated Title VII when it retaliated against her after she inquired about the company's Affirmative Action Plan (AAP).  It is alleged that after such inquiry, and directly connected thereto, Defendant failed/refused to promote her and then terminated her employment.

Title VII prohibits an employer from "discriminat[ing] against . . .  employees . . . because [the employee] has opposed any practice made an unlawful employment practice by [Title VII.]"

---

[28] *See also Dew v. Health Ins. Plan of Greater New York*, 1999 WL 684158, at *5-6 (E.D.N.Y. Jul. 15, 1999) (finding plaintiff failed to carry his burden in the *McDonnell Douglas* burden shifting test where the evidence presented "preclud[ed] any rational inference that discrimination played any part in [defendant's] decision to terminate [the plaintiff]"), *aff'd* 208 F.3d 202 (2d Cir. 2000); *Sanders v. Mount Sinai Medical Ctr.*, 1999 WL 1029734, at *6-7 (S.D.N.Y. Nov. 10, 1999) (alleged comments regarding plaintiff's "nappy" hairstyle, that supervisor could fire anyone she didn't like, and that African-American people are lazy are not enough to raise inference of discrimination and since the speaker was not the only decision maker regarding termination, it cannot be said that a reasonable inference of discrimination can be attributed to the collective decision made to terminate plaintiff).

42 U.S.C. § 2000e-3(a).  Like claims of discrimination, retaliation claims are generally governed

by the *McDonnell Douglas* burden-shifting framework.  *See, e.g., Quinn v. Green Tree Credit Corp.*,

159 F.3d 759, 768 (2d Cir. 1998); *see also Anderson v. S.U.N.Y. Health Sci. Ctr. at Syracuse*, 826

F. Supp. 625, 631 (N.D.N.Y. 1993).

To establish a *prima facie* case for retaliation, a plaintiff must show that "(1) the employee

was engaged in protected activity; (2) the employer was aware of that activity; (3) the employee

suffered an adverse employment action;[29] and (4) there was a causal connection between the

protected activity and the adverse employment action." *Reed v. A.W. Lawrence & Co., Inc.*, 95 F.3d

1170, 1178 (2d Cir. 1996) (citation omitted).

"A 'protected activity' under Title VII refers to a person's opposition to 'an unlawful

employment practice' or a person's assistance or participation in 'an investigation, proceeding, or

hearing' under Title VII." *Brady v. KBI Sec. Serv., Inc.*, 91 F. Supp. 2d 504, 512 (E.D.N.Y. 2000)

(quoting 42 U.S.C. § 2000e-3(a)).  The employee need not show that the conduct opposed was in

fact a violation of Title VII, but she must demonstrate a "good faith, reasonable belief that the

underlying challenged actions of the employer violated the law." *Manoharan v. Columbia Univ.*

*College of Physicians & Surgeons*, 842 F.2d 590, 593 (2d Cir. 1988) (citation omitted).  General

complaints about working conditions unrelated to discriminatory employment practices will not

suffice.  The complainant must put the employer on notice that he or she believes discrimination is

---

[29] Recently, the Supreme Court noted that Title VII's proscription against discrimination and retaliation are not "coterminous" – "[t]he scope of the anti-retaliation provision extends beyond workplace-related or employment related retaliatory acts and harm." *Burlington Northern and Santa Fey Ry. Co. v. White*, __ U.S. __ 126 S.Ct. 2405, 2414 (2006) (noting the discrepancy amongst the Circuits regarding whether adverse actions in retaliation claims must be employment related and answering such inquiry in the negative).  In this regard, to satisfy prong three, a plaintiff must show "that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 2415 (internal quotation marks and citations omitted).  Whether Plaintiff satisfies prong three is not at issue.

occurring. *Id.* at 593-94 (noting that the employee's objections over appointment of white candidate did not point to any discrimination against particular individuals nor discriminatory practices).

Here, Lawrence contends that when she asked Howe about Thomson's commitment to the AAP and making leadership training available to her, Howe became dismissive.[30]   Thereafter, interactions with Howe were unpleasant.   Ultimately, Lawrence associates her interrogatory with Thomson's failure to promote and the termination of her employment.   In support of her *prima facie* case, it is Lawrence's contention that her questions constitute protected activity.   However, mere inquiry about the AAP is not an <u>allegation</u> of an <u>unlawful employment practice</u>, and thus, does not constitute protected activity. *Manoharan v. Columbia Univ. College of Physicians & Surgeons*, 842 F.2d at 594 (cited in *Collazo v. BBDO NY*, 1997 WL 746447, at *4 n.9 (S.D.N.Y. Dec. 3, 1997), *aff'd without opin.*, 165 F.3d 13 (2d Cir. 1998), for the proposition that plaintiff's allegation that he was retaliated against for speaking out against the absence of an AAP does not constitute protected conduct as such statements are not allegations of unlawful employment practice).

Detracting further from Plaintiff's self-professed protected activity is the fact that affirmative action in employment practices is not required by Title VII, 42 U.S.C. § 2000e-2(j), therefore, "an employer's failure to follow its own voluntary affirmative action program cannot, by itself, constitute an unlawful employment practice[.]" *Manoharan v. Columbia Univ. College of Physicians & Surgeons*, 842 F.2d at 594.   Or, stated another way, even if we were to find that Thomson failed

---

[30] Having filed her NYSDHR charge on January 23, 2004, we previously decided that Lawrence's discrimination claims arising in August 2002 were time barred.   Despite this holding, we may nonetheless consider certain acts occurring in August and October 2002 as background evidence supporting Lawrence's claim of retaliation. *See Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 176 (2d Cir. 2005) ("The statute of limitations requires that only one alleged adverse employment action have occurred within the applicable filing period.   But evidence of an earlier alleged retaliatory act may constitute relevant 'background evidence in support of [that] timely claim.'" (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002)).

to adhere to its AAP in providing Lawrence an avenue for advancement, such failure does not constitute an unlawful employment practice pursuant to Title VII.  *See id*; *Longshore-Pizer v. Connecticut*, 451 F. Supp. 2d 401, 410 (D. Conn. 2006) (noting that at the time plaintiff complained about training and performance evaluations, there was "nothing in the record to suggest that [plaintiff] was protesting the type of discrimination that Title VII sanctions" and thus was not protected activity).

In fact, by her own admission, her questions regarding the AAP were just that – questions. No where did she make a complaint, formal or informal, to anyone that Thomson <u>engaged in unlawful practices</u>.   Compl. at ¶ 32 ("Plaintiff inquired about Thomson's purported Equal Employment Opportunity and Affirmative Action policies."); ¶ 34 ("In October 2002, Plaintiff discussed her concerns about Thomson's compliance with its own Affirmative Action Plan with Thomson executive staff."); Lawrence Aff. at ¶ 7 ("As part of the dialog in August of 2002 on the issue of leadership training, I inquired of Mr. Howe on the details of Defendant's Affirmative Action Program."); ¶ 7 ("I expressed my dismay over this apparent lack of commitment to an Affirmative Action Program."); ¶ 21 (noting Ms. Gerrain failed to adhere to the AAG when she failed to utilize objective criteria for the hiring process but failing to indicate whether she complained to anyone); Lawrence Dep. at p. 110, lines 13-17 ("I asked [Howe] specifically about the affirmative action protocols, and I believe [Howe] said something to the effect of, you know, that's not under consideration here."); p. 120, lines 16-23 & p. 121, line 1 ("I had asked for the affirmative action plan to be taken into consideration and was, in my estimation, blatantly told no, that this was not going to be taken into account, that you would not be eligible for additional leadership training or training of any sort solely because of the affirmative action plan or the affirmative action policy[.]").

Since Lawrence fails to frame her charge as though she made a good faith based challenge to an employment activity she perceived to be unlawful, it cannot be said she engaged in any protected activity.

Thus, Lawrence doesn't even get past prong one of her retaliation *prima facie* case. But, even if in drawing all reasonable inferences in favor of Plaintiff we presumed that in making her inquiries she made a good faith based complaint about what she believed was an unlawful employment practice, Lawrence still cannot satisfy her *prima facie* burden because she cannot show any causal connection to the adverse employment actions.

It is Lawrence's contention that her inquiries, or rather complaints, to Howe in or around October 2002 were interconnected to Thomson's failure to promote her, almost four months later, and to her termination in June 2003, almost nine months later. A causal connection may be established "indirectly by showing that the protected activity was closely followed in time by the adverse action." *Griffin v. Ambika Corp.*, 103 F. Supp. 2d at 312 (quoting *Manoharan v. Columbia Univ. College of Physicians & Surgeons*, 842 F.2d at 593). The temporal proximity between the protected activity and the adverse action must be "very close[.]" *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (citing cases where three and four month lapses were insufficient and finding that action taken twenty months after protected activity "suggests, by itself, no causality at all"). We acknowledge that the Second Circuit has not drawn a bright line "to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship," but district courts in this Circuit have "consistently held that a passage of more than two months between the protected activity and the adverse employment action does not allow for an inference of causation." *Garrett v. Garden City Hotel, Inc.*, 2007 WL 1174891, at *21 (collecting cases). The

appreciable lapse of time between the alleged protected activity and the retaliatory acts weighs heavily against Plaintiff's ability to establish her *prima facie* case.

In any event, reliance on timing alone is insufficient in making out a case of discriminatory retaliation. *Vails v. The Police Dep't of the City of New York*, 54 F. Supp. 2d 367, 378 (S.D.N.Y. 1999) (collecting cases). Lawrence must provide evidence that denotes a connection between the protected activity and the retaliatory acts. Courts will not apply a theory of *post hoc ergo propter hoc*, or "after this, therefore, because of this." *Wilson v. Reuben H. Donnelley Corp.*, 1998 WL 770555, at *4 (S.D.N.Y. Nov. 2, 1998); BLACK'S LAW DICTIONARY 1205 (8th ed. 2004). With regard to Thomson's failure to promote Lawrence, it was Gerrain, not Howe, who was the final decision maker as to the new hire. Howe's role in the process was limited to being an interviewer and aiding Gerrain in creating the fifteen competencies from which the team of interviewers would provide numerical scores for each candidate. Unanimously, each interviewer gave Dickinson an overall higher score than Lawrence. Lawrence does not postulate that Howe had any influence on any particular interviewer's questions and scoring capabilities. Nor is it clear whether she believes that a conspiracy existed amongst the interviewers. *See supra* Part II.D.1 at pp. 37-38 (discussing Lawrence's convoluted testimony of a conspiracy theory). Instead she claims that the competencies as drafted by Howe and Gerrain failed to comport with the company's AAP in that the scorecard was not based on objective criteria. Even if the scorecard did fail to comport with the AAP and was subjective, Lawrence has not provided any evidence, direct, indirect, or circumstantial, to allow for an inference that **racial animus/retaliation** was the driving force behind the drafted scorecard and/or the decision to promote Dickinson instead of Lawrence. As explained above, Lawrence's circuitous testimony on whether any of the interviewers acted with racial animus or participated in

a concerted conspiracy to prevent her promotion exemplifies Lawrence's unsureness as to the motivation underlying the decision to promote Dickinson.  Pointedly, Plaintiff has not proffered any evidence that Gerrain, who became the VP of CESBU in January 2003 and the sole individual in charge of the promotion decision, had any knowledge of Howe and Lawrence's prior discussion concerning the AAP.  *See Uddin v. City of New York*, 427 F. Supp. 2d 414, 433 (S.D.N.Y. 2006) (plaintiff fails to establish causal link between protected activity and failure to promote wherein no evidence was presented imputing knowledge of the protected activity to the sole decision-maker on promotions).

In this regard, just as Lawrence has difficulty meeting her burden with the retaliatory failure to promote claim, it follows that she similarly cannot meet her burden with regard to her retaliatory termination, which occurred nine months after the putative protected activity.  "Retaliatory discharge in violation of Title VII occurs when a retaliatory motive plays a part in [the discharge], . . . whether or not it was the sole cause . . . [or] when an employer is motivated by retaliatory animus, even if valid objective reasons for the discharge exist."  *Reed v. A.W. Lawrence & Co., Inc.*, 95 F.3d at 1177-78 (citation omitted) (alterations in original).  The overwhelming admissible evidence shows that Plaintiff's discharge had no connection to any alleged protected activity but rather was based on Plaintiff's performance, or rather Thomson's dissatisfaction with Plaintiff's performance.  *See Anderson v. S.U.N.Y. Health Sci. Ctr. at Syracuse*, 826 F. Supp. 625, 631 (N.D.N.Y. 1993).  "An inference of causation is defeated (1) if the allegedly retaliatory discharge took place at a sufficiently distant time after the protected activity; or (2) if there was an 'intervening causal event that occurred between the protected activity and the allegedly retaliatory discharge.'"  *Garrett v. Garden City Hotel, Inc.*, 2007 WL 1174891, at *20 (quoting *Yarde v. Good Samaritan Hosp.*, 360 F. Supp. 2d

552, 562 (S.D.N.Y. 2005)).  Here, Defendant provides evidence of both.  First, as previously stated, the discharge occurred nine months after her inquiry.  And, the March Warnings and the June Funding Incident are intervening events providing considerable distance between the AAP inquiries and alleged retaliatory discharge.  Again, Plaintiff fails to show how her concerns regarding the firm's AAP were causally connected in any way to her discharge.  As with the failure to promote, Howe was not a final decision maker on matters of termination.  In fact, such decision was made by Gerrain and Roberson, though they did get input from Dickinson and Howe.

Nevertheless, as with Lawrence's other discrimination claims, even if she had made a *prima facie* showing of discriminatory retaliation, Defendant has offered legitimate, non-retaliatory reasons supporting the decisions in not promoting and firing Lawrence as outlined fully above.  Such reasons have not been adequately rebutted by Lawrence, and given the weakness of her *prima facie* case, she fails to carry her ultimate burden of showing circumstances giving rise to an inference of retaliation.  Thus, summary judgment is properly **granted** and Lawrence's claim of retaliation is **dismissed**.

### F.  Hostile Work Environment

In her Complaint, Lawrence asserts that she was subjected to excessive scrutiny, unwarranted criticism, rude and unprofessional behavior, isolation, warnings and threats of discipline, personal attacks, a racial comment, and a refusal to provide promised training necessary for advancement.  Compl. at ¶ 60.  As a result of the foregoing, Lawrence contends she was subjected to a hostile work environment in violation of Title VII.  From what we can gauge, Lawrence bases her hostile work environment claim on the events surrounding the March 2003 Warnings and June 2003

Termination.[31]  *See* Goldberg Decl., Ex. 1 at ¶ 15 (Plaintiff's Answers to Defendant's Interrogatory regarding the basis for her hostile work environment claim).

To establish that Thomson created a hostile work environment based upon race, Plaintiff must show "(1) that her workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of her work environment and (2) that a specific basis exists for imputing the conduct that created the hostile work environment to the employer."  *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 715 (2d Cir. 1996) (citation omitted); *see also Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000).  "The conduct alleged must be severe and pervasive enough to create an environment that '**would reasonably be perceived, and is perceived**, as hostile or abusive."  *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) (emphasis added) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22 (1993)); *see also Harris v. Forklift Sys., Inc.*, 510 U.S. at 21  ("Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment – an environment that a reasonable person would find hostile or abusive – is beyond Title VII's purview.").

In determining whether an environment is hostile or abusive, courts should consider "(1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or a mere offensive utterance; (4) whether it unreasonably interferes with an employee's work performance; and (5) what psychological harm, if any, resulted."  *Griffin v. Ambika Corp.*, 103

---

[31] As with her time-barred Failure to Promote claim, Plaintiff's opposition papers do not address Defendant's Motion for Summary Judgment on her Hostile Work Environment claim, and so we may now properly deem such claim abandoned and grant summary judgment on that basis alone.  *See Taylor v. City of New York*, 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003) ("Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way." (citation omitted)); *see also Garrett v. Garden City Hotel, Inc.*, 2007 WL 1174891, at *17 (citing cases).  We will nevertheless assess this claim based on the admissible evidence submitted.

F. Supp. 2d at 313 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. at 23); *see also Feingold v. New York*, 366 F.3d 138, 150 (2d Cir. 2004). "Title VII does not make employers liable for being mean or petty; it makes them liable for discriminating, for firing people or subjecting them to adverse employment determinations on account of their being a member of a protected class." *Ticali v. Roman Catholic Diocese of Brooklyn*, 41 F. Supp. 2d 249, 263 (E.D.N.Y. 1999) (citation omitted); *see also Brady v. KBI Sec. Serv., Inc.*, 91 F. Supp. 2d 504, 509 (E.D.N.Y. 2000).

Simply put, the events surrounding the March 2003 Warnings and June 2003 Termination do not rise to the scurrilous and assiduous level of creating a hostile work environment as contemplated by Title VII. Lawrence contends a hostile work environment ensued when she received unwarranted warnings and threats of discipline. Even if her estimation of baselessness is correct and we were to find that Lawrence's behavior did not warrant warnings and/or threats of discipline, the isolated incidents occurring in March 2003 can hardly be categorized as pervasive or as permeating her work environment such that working conditions were altered. *See Cruz v. Coach Stores, Inc.*, 202 F.3d at 570 ("Isolated instances of harassment ordinarily do not rise to this level."); *see also Snell v. Suffolk County*, 782 F.2d 1094, 1103 (2d Cir. 1986) ("Casual comments, or accidental or sporadic conversation, will not trigger equitable relief pursuant to [Title VII]."). In fact, Lawrence has not offered an iota of evidence to allow this Court to deduce or even draw the inference that conflict or tension pervaded the work environment during the period between March and June 2003. Without the benefit of such details, no rational trier of fact could find a hostile work environment existed.

Nor, as set forth in rigorous detail above, has Lawrence submitted evidence that racial animus underlaid the warnings and ultimate termination. In fact, the only event which can, by a

scintilla, be associated with the taint of discrimination is Dickinson's infamous "scary person" comment. But use of the phrase "scary person" is not inherently racially offensive without more specificity as to the context of usage. *Cruz v. Coach Stores, Inc.*, 202 F.3d at 570 (depends on totality of circumstances).[32]

And, even if we were to agree that the phrase "scary person" is imbued with racial animus, "mere utterance of an . . . epithet which engenders offensive feelings in an employee . . . does not implicate Title VII." *Harris v. Forklift Sys., Inc.*, 510 U.S. at 21; *see also Shabat v. Blue Cross Blue Shield of Rochester Area*, 925 F. Supp. 977, 984 (W.D.N.Y. 1996) (quoting *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 67 (1986)). This one instance of a purportedly racial comment does not make a federal case. *Schwapp v. Town of Avon*, 118 F.3d at 110 (internal quotation marks and citations omitted) ("[T]here must be more than a few isolated incidents of racial enmity . . . there must be a steady barrage of opprobrious racial comments[.]"). "As a general rule, incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Feingold v. New York*, 366 F.3d at 150 (internal quotation marks and citations omitted)). While a single act can create a hostile work environment "if it in fact works a transformation of the plaintiff's workplace[,]" the plaintiff must demonstrate "that a single incident was extraordinarily severe[.]" *Id.* (citation omitted); *Cruz v. Coach Stores, Inc.*, 202 F.3d at 570 (internal quotation marks and citations omitted)). Plaintiff fails to make such a showing and her own "perception that [her] work

_____

[32] *Cf. Dorrilus v. St. Rose's Home*, 234 F. Supp. 2d 326, 334-35 (S.D.N.Y. 2002) (use of phrase "hey you" has no discriminatory overtone and is at most impolite and, while the use of the phrase "El Negro" understandably engendered offensive feelings, it does not "significantly affect the conditions of employment to implicate Title VII[,]" nor did plaintiff adduce enough facts for a reasonable jury to gauge the frequency of such remarks); *Griffin v. Ambika Corp*, 103 F. Supp. 2d at 314 (defendant's alleged use of phrases "street person," "break up the gang," and "you people" was not actionable); *Clerge v. Edison*, 1999 WL 239688, at *3 (S.D.N.Y. Apr. 23, 1999) (supervisors reference to plaintiff as "boy" with out more is not actionable).

*-67-*

environment was hostile is not enough[.] . . . [T]o prevail on [a hostile work environment] claim, it is also necessary that plaintiff's work environment be *objectively* hostile.  *Shabat v. Blue Cross Blue Shield of Rochester Area*, 925 F. Supp. at 982-83 (emphasis in original).

With regard to Lawrence's contention that her work was subjected to more scrutiny and that certain individuals, presumably Gerrain, Howe, and Dickinson, were rude to her, we similarly note that Lawrence has not provided a shred of evidence for the inference to be drawn that such acts were based upon racial animus.  "[I]t is more likely that the hostility plaintiff[] encountered 'largely reflected a clash of personalities rather than discriminatory animus.'"  *Griffin v. Ambika Corp.*, 103 F. Supp. 2d at 315 (quoting *Kodengada v. I.B.M. Corp.*, 88 F. Supp. 2d 236, 243 (S.D.N.Y. 2000)). And even if racial animus was at hand, Lawrence fails to present evidence that such scrutiny and rude behavior were severe, physically threatening, or humiliating, nor has she demonstrated how the inappropriate behavior interfered with Lawrence's work performance.  Finally, Plaintiff provides no evidence of any psychological harm resulting from any pernicious harassment.  "Where the acts alleged against defendants are merely offensive, rather than physically threatening, humiliating, or hampering to plaintiff's job performance, summary judgment is properly granted."  *Griffin v. Ambika Corp.*, 103 F. Supp. 2d at 313 (citing *Cruz v. Coach Stores, Inc.*, 202 F.3d at 570); *see also Dorrilus v. St. Rose's Home*, 234 F. Supp. 2d at 335 (quoting *Griffin*, 103 F. Supp. 2d at 314, and noting plaintiff failed to provide any "concrete or expert evidence of psychological harm or witnesses to the alleged incidents that could attest to [his] level of humiliation.").

Lastly, there is no merit to Plaintiff's contention that the denial of leadership training created a hostile work environment.  First, even if Lawrence contends that the denial of training contributed to a subjective hostile environment, there is nothing objectively hostile about the failure to offer

leadership training.  Additionally, as with her claims of scrutiny and rude behavior, Lawrence has not presented evidence indicating racial animus drove the decision to deny her such training.  Nor has she established the necessary factors to make out such a claim, including severity, physically threatening behavior, interference with performance, and psychological harm.  In fact, Plaintiff was offered an opportunity to undergo a 360 review, which was generally unavailable to persons in her non-managerial position.  Yet, Thomson executives set up this privilege for Lawrence.  If anything, the concessions made in providing Lawrence an opportunity not available to other employees at her level detracts tremendously from Lawrence's hostile work environment claim.

The Court concludes, as a matter of law, that the alleged discriminatory conduct imputed to Defendant fails to rise to the level of severity required to support a claim of hostile work environment.  *See Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (holding that "simple teasing . . . offhand comments, isolated incidents (unless extremely serious)" are not discriminatory changes in the "terms and conditions of employment"); *Brennan v. Met. Opera Ass'n, Inc.*, 192 F.3d 310, 318 (2d Cir. 1999) (holding that "[i]solated, minor acts or occasional episodes do not warrant relief"); *Williams v. Cty. of Westchester*, 171 F.3d 98, 100-01 (2d Cir. 1999) (holding that to meet his burden, the plaintiff must show "more than a few isolated incidents" and that "evidence solely of sporadic" discrimination does not suffice); *Garrett v. Garden City Hotel, Inc.*, 2007 WL 1174891, at *19 (dismissing plaintiff's hostile work environment claim on the basis that plaintiff's complaints of two allegedly discriminatory remarks and the denial of training and promotion opportunities to be "episodic" at best and are not "sufficiently continuous and concerted in order to be deemed pervasive"); *Knight v. City of New York*, 303 F. Supp. 2d 485, 500 (S.D.N.Y. 2004) (officer was not subjected to an objectively hostile work environment); *Turner v. Nat'l R.R. Passenger Corp.*, 181

F. Supp. 2d 122, 132-33 (N.D.N.Y. 2002) (holding that co-employees use of word "nigger" when discussing O.J. Simpson trial, while offensive, did not rise to the level of a steady barrage and were not directed at plaintiff, thus, no hostile environment was created); *Ruggieri v. Harrington*, 146 F. Supp. 2d 202, 217-18 (E.D.N.Y. 2001) (holding that a "collection of administrative mixups, minor annoyances, and perceived slights cannot be considered severe or pervasive harassment"); *Francis v. Chem. Bank. Corp.*, 62 F. Supp. 2d 948, 959 (E.D.N.Y. 1999) (dismissing hostile work environment claim where plaintiff only alleged four incidents).

Accordingly, summary judgment is **granted** on Plaintiff's hostile working environment claim.

### III.  CONCLUSION

Having no genuine material issue of fact, the Court concludes that Plaintiff's claims fail as a matter of law.

**WHEREFORE**, it is hereby

**ORDERED**, that Defendant's Motion for Summary Judgment (Dkt. No. 17) is **GRANTED** and Plaintiff's Complaint is **DISMISSED**; and it is further

**ORDERED**, that Judgment be entered on behalf of Defendant; and it is further

**ORDERED**, that the Clerk of Court serve a copy of this Memorandum Decision and Order upon the parties to this action as set forth in the Local Rules.

**SO ORDERED**.

Date:   June 1, 2007
        Albany, New York

RANDOLPH F. TREECE
United States Magistrate Judge